**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| BRAYDEN URDAN, individually and on behalf of all others similarly situated, | Case No. |
| *Plaintiff*, | |
| v. | |
| SWEEPSTEAKS LIMITED d/b/a STAKE.US, | |
| *Defendant*. | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Brayden Urdan ("Plaintiff") brings this case, individually and on behalf of all others similarly situated, against Defendant Sweepsteaks Limited d/b/a Stake.us ("Stake" or "Defendant") to enjoin its operation of illegal online casino games and to seek restitution, damages, and other appropriate relief. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and upon information and belief, including investigation conducted by his attorneys, as to all other matters.

### NATURE OF THE ACTION

1.      Stake.com is one of the most popular and profitable online casinos on the planet. As its co-founder Ed Craven proudly stated, "Stake[.com] has hit a point now where I'm confident our betting volume is the highest in the world out of any casino, land-based or online." Yet despite its global dominance, Stake.com was blocked from entering the U.S. market, where online gambling is highly regulated and banned entirely in many states, including Illinois. To evade these restrictions, Defendant created Stake.us—a platform marketed to U.S. consumers as a so-called "social casino" that does not permit real gambling. But in reality, Defendant Stake.us

1

is a virtual clone of Stake.com, rebranded to mislead regulators and consumers into believing it offers harmless gameplay instead of an unlawful gambling.

2.      On Stake.com, players buy chips, gamble, and cash out their winnings—just like at a regular casino. But Defendant knew that openly selling casino chips to U.S. customers would immediately expose Stake.us as an illegal online casino.

3.      To hide the true nature of its gambling operation, Defendant claims that the only chips it sells to consumers are harmless tokens called "Gold Coins," which can only be used for "casual" gameplay on the Stake.us platform, have no real-world value, and can never be cashed out. But here's the catch: Defendant bundles every purchase of Gold Coins with a second type of token called "Stake Cash" as a supposedly free bonus. Unlike Gold Coins, Stake Cash can be wagered on casino games and cashed out for real money at a fixed 1:1 ratio to the U.S. Dollar— exposing Stake Cash as a clear vehicle for real-money gambling.

4.      Defendant's pricing structure confirms that the true purpose of these transactions is to sell Stake Cash—not Gold Coins. Every dollar spent buys players an equivalent amount of Stake Cash, plus an enormous quantity of nearly worthless Gold Coins. For example, $20 buys 20.05 Stake Cash (and 200,000 Gold Coins), $50 buys 50.12 Stake Cash (and 500,000 Gold Coins), and so on. Despite Defendant's claim that players are purchasing harmless virtual tokens, the pricing structure and game play reveal that Stake Cash—not Gold Coins—is the real product Stake is selling to entice players into engaging in real-money gambling. The Gold Coins merely serve to deceive regulators and lure players under the guise of "safe" entertainment.

5.      Virtual gambling is highly addictive and strictly regulated in Illinois. By law, these games can only be offered by licensed operators in licensed, physical locations, where the Illinois Gaming Board ensures fair play and enforces consumer protection standards. Gambling

can never be offered to consumers over the Internet, as online gambling is expressly prohibited in Illinois. *See* 720 ILCS 5/28-1(a)(12) (criminalizing the operation of an "Internet site that permits a person to play a game of chance or skill for money or other thing of value").

6. By offering Stake Cash that can be wagered on games of chance over the Internet and redeemed for real money, Stake is operating an unlicensed and illegal online casino. And without any oversight or accountability, Defendant flouts Illinois gambling regulations by, for example, failing to provide gambling addiction resources for problem gamblers. 230 ILCS 10/13.1(a); 11 Ill. Admin. Code 1800.1750.

7. Defendant's misconduct inflicts severe harm on vulnerable populations, especially individuals prone to gambling addiction and younger consumers targeted through its "free play" marketing. Stake floods social media platforms with slick ads, influencer videos, and flashy visuals, making its games seem safe, fun, and harmless. By masking its real-money gambling platform as just another "social casino," Stake creates exactly the kind of dangerous environment that Illinois gambling laws were designed to stop. This deliberate obfuscation exposes Illinois consumers to significant risks of financial ruin, psychological distress, and gambling addiction.

8. Accordingly, Plaintiff Urdan, on behalf of himself and other similarly situated individuals, brings this lawsuit to expose Stake's predatory practices, recover funds lost by its victims, and dismantle its deceptive and unregulated gambling operations.

## PARTIES

9. Plaintiff Brayden Urdan is a natural person and citizen of the State of Illinois.

10. Defendant Sweepsteaks Limited is a Cyprus Limited Company with its principal place of business located at 28 Oktovriou, 313 Omrania BLD, Limassol, CY-3105, Cyprus.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

12.     This Court has personal jurisdiction over Defendant because it conducts substantial, continuous, and systematic business in Illinois—including by entering into contracts with Illinois residents and engaging in ongoing economic relationships with them. Furthermore, Defendant purposefully directed its activities to the District by providing services to the residents of this District that it knew would be used within this District, advertising its services in Illinois, and actually profiting from the resulting gambling taking place in Illinois on its platform.

13.     Venue is proper in this District under the provision of 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial District, Defendant is subject to personal jurisdiction in this District, and Defendant transacts business in this District. Further, venue is proper under 28 U.S.C. § 1391(c)(3) because Defendant is a foreign entity.

## STATEMENT OF FACTS

**I.      Defendant Stake.us is an Online Casino That Facilitates and Profits Enormously from Real-money Gambling.**

14.     In the United States, lawful gambling has historically been limited to physical casinos or authorized venues where regulatory agencies and oversight bodies closely monitor gambling operations and enforce compliance with established standards. These controlled environments are designed to protect consumers by promoting fairness, ensuring transparency, and maintaining safeguards against exploitation and misconduct.

15.     With advancements in technology, gambling has expanded beyond physical venues to online platforms, creating new opportunities and challenges for regulators. States that permit online gambling have adapted their legal frameworks to uphold the same standards of consumer protection and regulatory accountability established for traditional casinos.

16.     In states where online gambling is permitted, casino platforms are required to operate transparently, offering clear money-for-chance exchanges that are explicitly acknowledged as gambling and are subject to strict regulatory oversight to ensure compliance with state laws.

17.     Online gambling is not permitted in Illinois. The Illinois Legislature expressly prohibits any "Internet site that permits a person to play a game of chance or skill for money or other thing of value." 720 ILCS 5/28-1(a)(12). This prohibition reflects the state's public policy against online gambling, ensuring that consumers are not exposed to the risks of fraudulent or predatory practices commonly associated with such operations, especially where, as here, they are accessible 24 hours-a-day, 7 days-a-week through computers and mobile devices.

18.     Despite Illinois's clear prohibition on online gambling, Stake.us operates as a thinly disguised copy of Stake.com—an openly acknowledged gambling site. Indeed, a side-by-side comparison of the two platforms reveals that Stake.us is virtually identical in appearance and layout to Stake.com, as illustrated by Figures 1 and 2, below:



**(Figure 1, Stake.com)**          **(Figure 2, Defendant Stake.us)**

19.     Both websites prominently feature many of the same casino games and share identical color schemes, graphics, logos, visual themes, and have virtually indistinguishable user interfaces. These similarities are no accident—Stake.us was deliberately created as a replica of Stake.com's highly profitable gambling platform, strategically rebranded to evade U.S. gambling regulation.

20.     As discussed below, the Stake.us casino platform allows players to purchase and wager "Stake Cash"—digital tokens that, like chips in a brick-and-mortar casino, can be redeemed at a 1:1 ratio to the U.S. Dollar—on games of chance, including slot machines, bingo, blackjack, roulette, and other casino-style offerings. Effectively, Defendant operates an unlicensed and illegal online casino within Illinois.

**A.      Stake's Platform Provides Games of Chance That Replicate An Authentic Casino Experience.**

21.     Stake provides players with online casino-style games, including virtual slot machines, bingo, scratch cards, and roulette. These games are designed to be pure games of chance, with outcomes entirely dictated by algorithms simulating randomness. Players have no genuine ability to influence outcomes through skill or strategy. Stake recognizes this, touting that

6

its "[s]lot games are fun games of chance" and that its "[s]cratch card games are a game of luck."[1]

      22.     Under Illinois law, a game of chance involves any activity where an outcome is determined predominantly by chance rather than skill. *Dew-Becker v. Wu*, 178 N.E.3d 1034, 1040 (Ill. 2020). Defendant's games fall squarely within this definition because players wager Stake Cash on virtual casino-style games whose outcomes are determined exclusively by random number generators ("RNGs"),[2] precisely replicating the randomness and unpredictability of physical slot machines and other chance-based games found in brick-and-mortar casinos.

      23.     Defendant aggressively emphasizes the purely chance-based nature of its games to entice players with the prospect of substantial payouts. Stake frequently promotes the potential for large winnings on its branded social media channels, as illustrated in Figure 3 below:



**(Figure 3)**

<hr />

[1]      Stake.us, https://stake.us/casino/home (last accessed April 4, 2025).
[2]      There can be no dispute that Stake's games are considered "games of chance" under Illinois law, as Stake admits that its RNGs use "an algorithm that produces a random sequence of numbers which cannot be predicted. RNGs are at the core of online slot games and virtual table games, providing the excitement that makes them so entertaining to play."

24.     Figure 3 prominently advertises a massive payout on Stake's "Sugar Rush 1000" slots game, where a small wager of 5 Stake Cash resulted in a 63,623.50 Stake Cash win—a multiplier of 12,724.70 times the original bet. This form of marketing strategically exploits consumers' hope for enormous returns despite slim odds. The Sugar Rush 1000 game itself is depicted in Figure 4 below:



**(Figure 4)**

25.     The absence of skill components further underscores the games' reliance on chance. For instance, virtual slot machines require only the push of a button to spin reels whose outcomes are entirely RNG-determined. Similarly, bingo and scratch cards depend exclusively on random chance, offering players no opportunity to influence outcomes.

26.     Defendant purposefully replicates key features of licensed casino games to deliver an authentic gambling atmosphere. The visual design—including spinning reels, celebratory animations, jackpot notifications, and dynamic audio effects—is intentionally crafted to trigger psychological responses identical to those experienced in traditional casinos.

27.     By offering these games of chance, Defendant is operating an unregulated online casino in violation of Illinois law, which explicitly prohibits gambling on games of chance conducted over the Internet. 720 ILCS 5/28-1(a)(12). Defendant's deliberate creation of realistic

casino experiences reinforces the unlawful nature of its operations and amplifies the risks to Illinois residents.

28.     But Defendant does not stop at virtual slots or simulated games. To further enhance authenticity, Stake offers "Live Dealer Games" which it describes as allowing players to "interact with human dealers" and experience "what it would be like to be at a land-based casino while you're sitting comfortably at home behind your computer screen or on your mobile device." Stake explained how Live Dealer Games function in a February 4, 2024 blog post, a screenshot from which is shown below in Figure 5[3]:



**How Do Live Dealer Games Work?**

Live dealer games are filmed in a studio with a human dealer and are uploaded in a live stream for your enjoyment. As a result, they provide a hybrid experience between playing online casino games and playing at physical casinos.

Rather than relying solely on RNG games, live dealer games utilize real cards and real tables, offering you a much more realistic and immersive experience.

This makes live dealer games extremely popular amongst online gamers, as you can see the roulette wheel spin or the cards being dealt in real time by your casino games hosts.

**(Figure 5)**

29.     Stake's Live Dealer Games feature professionally trained dealers seated at real casino tables, using physical playing cards, roulette wheels, and other genuine casino equipment, as depicted in Figures 6 and 7, below:

---

[3]      *How to Play Live Dealer Games*, STAKE.US, https://stake.us/blog/how-to-play-live-dealer-games (last visited Mar. 26, 2025).



**(Figure 6, Live Blackjack Table)**



**(Figure 7, Live Roulette Table)**

30. At these Live Tables, players wager Stake Cash, communicate via live chat with dealers and other players, and watch as dealers physically handle cards or spin the roulette wheel in real time. The realistic, immersive nature of these live dealer interactions intensifies the gambling experience, rendering it indistinguishable from gambling at traditional casinos.

31. For example, Figure 6 illustrates a live blackjack session, where participants actively wager Stake Cash directly against the dealer. Similar to traditional casinos, players directly win or lose real money based on each hand's outcome, reinforcing the genuine gambling environment that Stake carefully cultivates.

32.     By offering these chance-driven, realistic casino experiences online, Stake violates Illinois law, which strictly prohibits Internet gambling to protect consumers. Stake's conduct fosters precisely the addictive, financially ruinous, and psychologically damaging activities that Illinois law aims to prevent. This blatant disregard for regulations underscores the urgent need to protect consumers from Stake's unlawful and predatory practices.

**B.      The Dual Currency System.**

33.     Although Stake.com openly operates as the largest online casino in the world, it is barred from offering real-money gambling to consumers in the United States. To circumvent this prohibition, Defendant created Stake.us, a nearly identical clone of Stake.com that is rebranded as a free-to-play "social casino." Unlike Stake.com, Defendant prominently represents that the Stake.us "**PLATFORM AND GAMES DO NOT OFFER REAL MONEY GAMBLING**." (emphasis in original.) This façade relies entirely on a dual-currency system intentionally designed to obscure the fact that players are engaging in real-money gambling.

34.     Players on Stake.us are introduced to two types of virtual currency: Gold Coins ("GC"), which hold no monetary value and are marketed as being solely for entertainment purposes, and Stake Cash ("SC"), which can be redeemed for real money at a 1:1 exchange rate to the U.S. Dollar and serves as the true currency of Defendant's illegal gambling operations.

35.     Gold Coins are presented as the primary currency for casual gameplay. Players can earn a limited number of Gold Coins through daily logins or promotions and thereafter may purchase more Gold Coins to keep playing. Defendant makes clear that "Gold Coins are a virtual currency with no monetary value and can only be used for fun play. They cannot be redeemed."

36.     Stake Cash, on the other hand, is the true currency driving Defendant's unlawful online gambling operations. Although Defendant markets Stake Cash as merely a bonus token

included with Gold Coin purchases, Stake Cash has direct monetary value and can be redeemed at a fixed 1:1 ratio with the U.S. Dollar.

37.     Until recently, players could purchase and redeem Stake Cash using either fiat- or crypto-currency. However, as of the date of this filing, Stake requires players to purchase and redeem Stake Cash using cryptocurrency, including Bitcoin and Ethereum. To that end, Stake explicitly informs players that:

> Stake Cash will be redeemable at an implied rate of 1 Stake Cash per 1 USD. As such, the amount of cryptocurrency that can be redeemed per 1 Stake Cash will be determined by the market price of that cryptocurrency in USD at the time of such redemption.

38.     Thus, despite Defendant's deceptive claims, Stake Cash functions as real currency by directly linking virtual wagers to actual monetary value, allowing players to seamlessly convert their virtual gambling winnings into real-world money.

39.     Though Defendant tells players that no purchase is necessary to obtain Stake Cash, this representation is highly misleading. Players may acquire limited free Stake Cash through occasional promotions—such as receiving a single Stake Cash per day as a "Daily Login Bonus" or five Stake Cash by completing a cumbersome mail-in request—but these methods are deliberately obscure, impractical, and insufficient for regular gameplay. Ultimately, once a player's promotional Stake Cash is exhausted, the only viable way to continue gambling is to purchase additional Stake Cash.

40.     To obtain more Stake Cash, players must buy coin bundles containing both Gold Coins and Stake Cash. Defendant characterizes these transactions as primarily Gold Coin purchases with Stake Cash supposedly included as a "free" bonus. However, the pricing structure makes it clear that players are actually paying for Stake Cash.

41.     For every dollar spent on the coin bundles, players receive a nearly equivalent

amount of Stake Cash, as illustrated in Figure 8, below. For example, a bundle of 200,000 Gold Coins and 20.05 Stake Cash costs $20, a bundle of 500,000 Gold Coins and 50.12 Stake Cash costs $50, and a bundle of 3,000,000 Gold Coins and 300.75 Stake Cash costs $300. This pricing structure shows that Gold Coins serve only as a superficial disguise for the transaction of Stake Cash.



**(Figure 8)**

42.    Plaintiff Urdan and, on information and belief, the vast majority of players on the Stake.us platform, regularly buy additional coin bundles when they run out of Stake Cash even when they already possess hundreds of thousands or even millions of unused Gold Coins. The fact that players are making these repeated purchases when they have ample Gold Coins confirms that these transactions are driven entirely by the desire to obtain Stake Cash for real-money gambling, rather than for the Gold Coins Defendant claims to sell.

43.    Defendant's dual-currency structure transforms what appears to be an innocuous gaming platform into an unregulated online casino where players use real money to gamble on

games of chance. Courts throughout the country have found that when players spend money to obtain more "entries" or "bonus currency" despite already possessing unused amounts of the purported product (here, Gold Coins), there is unmistakable evidence that the "sweepstakes" or "promotion" is merely a front for gambling.

**II.    Stake Calls Itself a "Social Casino" to Lure Consumers and Hide Its Illegal Gambling Operation.**

44.    Stake promotes itself as a "Social Casino" to avoid gambling regulations and reassure potential players that it offers casino-style games purely for entertainment, without real-money stakes. Stake explains to consumers that:

> A Social Casino refers to an online platform that offers casino-style games for entertainment purposes, without involving real money. Instead, we use tokens (Gold Coins and Stake Cash).

> Users can enjoy a variety of casino games, such as slots, roulette and blackjack, but with the use of virtual currency–tokens–rather than real money. Platforms like ours are focused on creating a social and interactive gaming experience, allowing players to connect with friends, share achievements, and participate in virtual communities. 😁

45.    As part of its scheme to brand itself as a mere "social casino," Stake explicitly and fraudulently represents to consumers through its terms of service that its "**PLATFORM AND GAMES DO NOT OFFER REAL MONEY GAMBLING.**" (emphasis in original). Stake even goes so far as to represent that its "social casino has been tailor-made to provide *the ultimate social, safe and free gaming experience*." (emphasis added). These false representations intentionally mislead consumers into believing that they are participating in harmless gameplay rather than actual real-money gambling, even when wagering with Stake Cash.

46.    Stake further attempts to give consumers in Illinois (and elsewhere) additional comfort that they are not violating the law by identifying certain states where the platform is prohibited, thus creating the false and deceptive impression that Stake is being transparent

14

about the legality of its platform. Stake tells consumers that "while we welcome users from most states, we are currently unable to accommodate players from Washington, New York, Nevada, Kentucky, Idaho, Michigan, and Vermont – *due to the regulations of the mentioned states.*" (emphasis added). Stake goes even further, representing to consumers that it "operate[s] within the legal frameworks of states that permit Social Casino platforms" and that "[n]ot every state falls under this category, so to prevent misuse, we need to ensure that our customers come from the allowed states, *steering clear of those where our services aren't legally permitted.*" (emphasis added). Stake's terms of service also purport to exclude consumers in these states from its platform.

47.     However, once consumers join, the platform's carefully designed features start to funnel them away from casual gameplay (using Gold Coins) and into real-money gambling (using Stake Cash). Indeed, Stake deceptively describes Stake Cash as just another virtual token with "no cash value":

> Stake Cash is our virtual token currency, and this token–like Gold Coin–*has no cash value*. You may receive it as a free bonus with a Gold Coin bundle purchase, or obtain it up through cool promotions we offer on the platform. Not to forget the daily bonuses! Oh, and guess what? Stake Cash isn't just a token; you can redeem it for crypto prizes. (emphasis added).

48.     This representation is intentionally misleading. As discussed above, Stake Cash has direct monetary value and serves as the core component of Stake's gambling operation. Thus, while Stake publicly portrays itself as a harmless "social casino," it purposefully disguises the true nature of its platform, trapping unsuspecting consumers into real-money gambling under the guise of casual entertainment.

49.     Stake reinforces this deception through a carefully designed interface that seamlessly transitions players from casual gameplay using Gold Coins to gambling real money

with Stake Cash, as illustrated below in Figures 9 and 10, which depict Stake's casino-style slot game, *Wheel Big Winner*:



(Figure 9, Wagering Gold Coins)          (Figure 10, Wagering Stake Cash)

50.     At the top of every game on Stake's platform are toggles that enable players, with just a single click or tap, to switch between wagering non-monetary Gold Coins and Stake Cash. Figure 9 illustrates the game screen when a player wagers Gold Coins, and Figure 10 illustrates the seamless shift to wagering Stake Cash. This simple toggle mechanism is designed to make it as easy as possible for players to transition from casual, risk-free play to gambling with real-world stakes. Players who start out playing for fun—believing they are enjoying a harmless, "social" casino experience—can quickly and effortlessly shift to risking actual money without fully appreciating the financial consequences.

51.     For these reasons, many players are misled into believing they are engaging in harmless gaming, only to find themselves spending significant sums of money chasing Stake Cash winnings. Stake's platform uses celebratory animations, sound effects, and other psychological triggers—hallmarks of traditional slot machines—to keep players engaged and spending. This manipulation disproportionately affects vulnerable populations, including individuals susceptible to gambling addiction, who may not recognize the financial stakes until they have already suffered significant losses.

52.     To make matters worse, Stake imposes confusing "playthrough" requirements that make it more difficult for players seeking to redeem their winnings:

> For every amount of Stake Cash that you receive as a bonus alongside your purchase of Gold coins, you would need to play it through at least 3x over before redemption is available. So only Stake cash received alongside your purchase would have a rollover.
>
> Here is an appropriate example:
>
> If you purchase Gold coins and receive 10 Stake cash as a bonus, you are required to play through with at least 30 Stake cash before redemptions are available.
>
> After you complete the rollover you are free to redeem prizes with those funds, however if you, in the meantime, receive more SC alongside a new purchase Redemption section will still be locked until that amount of SC is played through 3X.

53.     In other words, players must repeatedly wager their Stake Cash winnings *three times* before they can redeem them for real money. This convoluted "playthrough" requirement significantly restricts players' ability to withdraw their winnings and compels them to keep gambling, thereby increasing their risk of further losses. Such deceptive practices not only underscore the fundamentally gambling-oriented nature of Stake's platform but also highlight the substantial risks it poses to unsuspecting users initially drawn in by promises of harmless entertainment.

## III.    Stake's Gambling Platform Fails To Provide Basic Consumer Protections That Are Required by Illinois Law.

54.     The harm caused by Stake's illegal gambling operation is further exacerbated by Defendant's lack of accountability and regulatory oversight. Unlike licensed casinos, which must comply with strict requirements to ensure fairness, transparency, and consumer protections, Defendant operates without these safeguards. The absence of oversight leaves players vulnerable to unfair practices, such as manipulated game outcomes, misleading promotions, and nonexistent or inadequate mechanisms to address problem gambling.

17

55. This is not just a theoretical danger—Defendant's online casinos actively undermine critical consumer protections required by Illinois law. For example, Defendant disregards the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the Illinois Gaming Board Self-Exclusion Program. *See* 230 ILCS 10/13.1(a) (Compulsive gambling) ("Each licensed owner shall post signs with a statement regarding obtaining assistance with gambling problems" at "[e]ach entrance and exit" and "[n]ear each credit location."); 11 ILL. ADMIN. CODE 1800.1750.

56. Instead of providing meaningful resources to address problem gambling, Defendant offers only a superficial and misleading commitment to "Responsible Play," framing the issue as one related to "computer games" rather than gambling: "[f]or most people, playing computer games is an enjoyable leisure and entertainment activity. But for some, playing computer games can have negative impacts." The Responsibly Play policy doesn't direct consumers to any gambling addiction resources, instead it informs users that they can take a short "break-in-play" or "self-exclude" their account for a set period of time. In fact, the only external resource mentioned on the "Responsible Play" page is a link to "Gaming Addicts Anonymous," which is inconspicuously buried in the footer and displayed in a smaller font than the Responsible Play policy. More to the point, Gaming Addicts Anonymous doesn't even address gambling addiction—rather, it's an organization designed to primarily assist individuals struggling with video game addiction.

57. To add further confusion, Stake maintains a separate webpage titled "Responsible Gaming"—distinct from its "Responsible Play" page—that provide links to the Financial Counseling Association of America and the National Foundation for Credit Counseling. Yet

18

these organizations offer guidance primarily related to general financial management and debt relief, not gambling addiction. Defendant's fragmented and misleading approach to providing resources highlights its deliberate choice to obscure the platform's gambling-related harms and evade accountability for the damage it inflicts on players.

58.     This harm is not just hypothetical. Stake operates a public chatroom where players can post messages to one another. Every day, the chat is inundated with posts by players describing how they have lost significant amounts of money gambling on Stake, with many complaining that they are stuck in a cycle where they win some nominal amount but lose much more. Allusions to self-harm are, unfortunately, not rare. Below are just a handful of posts from April 4, 2025, that are representative of the type regularly appearing on Stake:

- does anybody actually win here? Or is it a perpetual battle of losing, making it back and then losing again? I literally haven't been up in months
- I know why people kthemselves. They play on stake! Haha
- best comeback for me was i bought 20 package went to 3k then down ti last 20 again thennn went up to 3.6 then lost it all again lmaoooooo
- The lost it all is so real lol
- you break even then lose and lose and lose some more til you kys
- fr bruh, down 3k today already
- I missed my child support need 10x
- I've lost over a thousand bucks today
- You can't win because the site is a scam
- we all gotta walk away from this gambling site
- losing 7-14 times in a row happens very frequently, like its programmed to do that lol
- Yeah bro.. Was up to 2400. It was 2AM.. And I kept playing instead of going to sleep.. Rinsed it all. :(

59.     The inadequacy of Stake's approach is underscored by comparing it to the comprehensive gambling addiction resources provided by Stake.com. Unlike Stake.us—which

misleadingly frames gambling addiction as a mere issue of excessive video gaming—Stake.com explicitly acknowledges the serious nature of gambling addiction and directs players to specialized organizations such as Gamblers Anonymous, Gambling Therapy, the National Council on Problem Gambling, and Gamtalk. Each of these organizations is specifically dedicated to addressing *gambling* addiction—not *gaming* addiction—and provide targeted assistance, helplines, support groups, and professional treatment referrals. Stake.com's inclusion of these tailored resources demonstrates that Defendant is fully aware of the appropriate resources needed to support problem gamblers. By deliberately withholding these critical resources from Stake.us users, Defendant intentionally sacrifices the well-being of vulnerable consumers to maintain the fiction that its U.S. platform is merely a harmless "social casino," rather than the unlawful gambling operation it truly is.

**IV.      Stake Aggressively Advertises on Social Media.**

60.      Defendant leverages extensive social media campaigns to promote Stake, reaching millions of consumers across platforms such as Instagram, TikTok, and X.

61.      Stake's advertisements frequently feature videos of prominent influencers and celebrities gambling with Stake Cash and winning massive amounts, as illustrated in Figures 11 and 12 below:



**(Figure 11)**          **(Figure 12)**

62.     Figures 11 and 12 show screenshots of videos featuring paid influencers that

Stake has prominently posted on its Instagram account. Figure 11 depicts an influencer known as

"jaredfps" winning 100,000 Stake Cash playing Stake's Plinko game, promoted with the caption,

"HUGE DUB! A 100k SC hit for @jaredfps after yet another 1000x Plinko drop." Figure 12

depicts influencer "blessedmma" winning over 5,000 Stake Cash while playing the "Bonsai

Banzai" slots game.

63.     These influencer videos emphasize large monetary rewards using celebratory

animations and visuals of virtual coins cascading across the screen, enhancing the allure of

gambling. By showcasing popular influencers achieving substantial wins, Stake strategically

employs social proof and aspirational marketing to give the misleading impression that large

payouts are common, enticing users to shift from casual play into real-money gambling with

Stake Cash.

64.     Stake also routinely publishes social media posts highlighting enormous player

wins across various casino-style games, intentionally spotlighting the potential for massive

returns from modest wagers. As illustrated in Group Figure 13, below, these posts feature eye-

catching graphics to highlight extraordinary outcomes, such as a 16,907.50x multiplier on the "Joker Jam" slot that turned just 2 SC into 33,815 SC, a 606,960 SC payout on "Drac's Stacks," and an astounding 500,000 SC win from a single game of Keno:



**(Group Figure 13)**

65. These large payouts frequently promoted by Stake—such as the Joker Jam win of approximately 17,000x, Drac's Stacks win of 6,000x, and the Keno win of 500x—represent extraordinarily improbable events. Industry research suggests that a win exceeding 16,000x occurs less than once in tens of millions of spins, while a 6,000x payout typically occurs fewer than once per several hundred thousand attempts, and even a 500x return has less than a 0.01% probability per spin. *See*, *e.g.*, *Return to player: how much gaming machines payout*, UK Gambling Commission (June 16, 2021), https://www.gamblingcommission.gov.uk/public-and-players/guide/return-to-player-how-much-gaming-machines-payout. By prominently advertising these exceedingly rare outcomes, Stake exploits players' cognitive biases, creating a misleading impression that such extraordinary wins are achievable and frequent, thereby encouraging impulsive and risky gambling behaviors. Stake's deliberate use of this deceptive marketing tactic exploits consumers' cognitive biases, driving them to make impulsive wagers and chase unrealistic payouts, often resulting in significant financial losses and gambling-related harm.

66. Defendant also heavily promotes itself through celebrity endorsements and major

sports sponsorships. Its most prominent partner is the internationally famous rapper Drake, whose public wagering of enormous sums on Stake.com has created what industry experts call the "Drake Effect"—massively boosting the Stake brand's popularity, especially among younger, impressionable audiences who admire Drake's glamorous lifestyle. Drake is also directly sponsored by Stake.us, which prominently features him on its homepage, strategically using his celebrity influence to encourage impressionable users to gamble on Stake.us.

67.     Stake similarly sponsors global sports franchises and famous athletes, including Everton FC in the English Premier League and former UFC champion Israel Adesanya. These partnerships associate Stake with the excitement and legitimacy of elite professional sports.

68.     The point of Stake's aggressive sponsorship strategy is clear: by linking itself with globally admired celebrities and teams, Stake aims to normalize online gambling, increase consumer trust, and disguise the risks of gambling behind an appealing entertainment-focused image.

69.     Critically, Stake.us and Stake.com sponsor the exact same celebrities and sports teams, further demonstrating that Stake.us is simply a strategic copy of Stake.com, deceptively rebranded as a "social casino" to evade gambling regulations.

70.     Through its targeted and misleading marketing, Stake attracts users who remain largely unaware of the financial and emotional dangers involved, allowing Stake to maximize profits while escaping the accountability, oversight, and consumer protections required of legitimate gambling operations.

**FACTS SPECIFIC TO PLAINTIFF BRAYDEN URDAN**

71.     Plaintiff Urdan has been playing Stake games since approximately August 2022. Plaintiff Urdan has played several games of chance on Stake.us, including, but not limited to,

23

Wild West, Sweet Bonanza, and Le Viking.

72.　　After using the limited number of Stake Cash obtained through Defendant's promotions, Plaintiff Urdan purchased Stake Cash through Defendant's online store in order to continue playing. When Plaintiff Urdan ran out of Stake Cash, he would purchase more even though he still had many Gold Coins.

73.　　Plaintiff Urdan played various games of chance within Stake—including slot machine games such as Wild West, Sweet Bonanza, and Le Viking, and both simulated and live table games such as roulette, blackjack, and baccarat—where he would wager Stake Cash for the chance to win real cash prizes.

74.　　Since he started playing, Plaintiff Urdan has wagered and lost (and Defendant therefore won) more than $15,000 on Stake's games of chance. Just in the last six months, Plaintiff Urdan has wagered and lost (and Defendant therefore won) more than $10,000 on Stake's games of chance.[4]

## CLASS ACTION ALLEGATIONS

75.　　**Class Definitions**: Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of himself, an Illinois Class and an Illinois Loss Recovery Subclass (collectively, the "Classes") defined as follows:

> **Illinois Class**: All persons in Illinois who have lost fiat- or crypto-currency wagering on Defendant's online casino games.

> **Illinois Loss Recovery Subclass**: All persons in Illinois who have lost at least $50 in fiat- or crypto-currency wagering on Defendant's online casino games.

Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and

---

[4]　　Plaintiff notified Stake about this dispute on March 31, 2025. Stake responded on April 3, 2025, notifying Plaintiff that it had cut off access to his account.

members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

76. **Numerosity**: The exact number of members of the Classes is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, thousands of consumers fall into the definition of the Illinois Class and the Illinois Loss Recovery Subclass. Members of the Classes can be identified through Defendant's records, discovery, and other third-party sources.

77. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the putative Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions include, but are not limited to, the following:

      (a)    Whether Defendant is the proprietor for whose benefit the online casino games are played;

      (b)    Whether Defendant's online casino games are illegal under Illinois gambling laws;

      (c)    Whether Plaintiff and each member of the Classes lost money wagering on Defendant's online casino games;

      (d)    Whether Defendant's online casino games are games of chance under Illinois law;

      (e)    Whether Plaintiff and the Illinois Loss Recover Subclass members are entitled to recover their gambling losses under the Illinois Loss

Recovery Act, 720 ILCS 5/28-8;

(f)  Whether Defendant has violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*; and

(g)  Whether Defendant has been unjustly enriched as a result of its conduct.

78.  **Typicality**: Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendant's uniform wrongful conduct.

79.  **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Classes, as Plaintiff and each member of the Classes lost money playing Defendant's illegal casino games. Plaintiff also has no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the Classes.

80.  **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Classes, and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies and practices challenged herein apply to and affect members of the Classes uniformly, and Plaintiff's challenge of these practices and policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of

Defendant's liability to Plaintiff and to the other members of the Classes are the same.

81. **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy given that joinder of all parties is impracticable. The harm suffered by the individual members of the Classes is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be difficult for the individual members of the Classes to obtain effective relief from Defendant. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

82. Plaintiff reserves the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

### FIRST CAUSE OF ACTION
### Violation of the Illinois Loss Recovery Act
### 720 ILCS 5/28-8
### (On behalf of Plaintiff and the Illinois Loss Recovery Subclass)

83. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

84. Plaintiff brings this claim on behalf of himself and the Illinois Loss Recovery Subclass under the Illinois Loss Recovery Act, 720 ILCS 5/28-8, which was enacted to effectuate the State of Illinois' public policy against gambling.

85. 720 ILCS 5/28-8(a) provides that:

> Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof, with costs, in the circuit court.

86.     The Illinois Supreme Court has found that the "purpose of section 28-8(a) is not simply to undo illegal gambling transactions but 'to deter illegal gambling by using its recovery provisions as a powerful enforcement mechanism.'" *Dew-Becker*, 178 N.E.3d at 1037-38 (quoting *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997)).

87.     Plaintiff, Illinois Loss Recovery Subclass members, and Defendant are "persons" under 720 ILCS 5/28-8(a). *See* 720 ILCS 5/2-15 ("Person" means "an individual, natural person, public or private corporation . . . partnership, unincorporated association, or other entity.").

88.     The activity of "gambling" includes anyone who, *inter alia*, "knowingly establishes, maintains, or operates an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of the Internet," 720 ILCS 5/28-1(a)(12), "knowingly plays a game of chance or skill for money or other thing of value," 720 ILCS 5/28-1(a)(1), or "knowingly . . . uses . . . any gambling device." 720 ILCS 5/28-1(a)(3).

89.     The Illinois Loss Recovery Act defines a "gambling device" as a "slot machine or other machines or device for the reception of money or other thing of value" that on "chance or skill . . . is staked, hazarded, bet, won, or lost." 720 ILCS 5/28-2(a).

90.     Stake Cash constitutes money or a thing of value because its value is directly tied to the U.S. Dollar at a 1:1 ratio and can be redeemed for cryptocurrency through Defendant's platform. Just like casino chips in a brick-and-mortar casino, Stake Cash serves as a proxy for real currency, allowing players to wager, win, and ultimately cash out their balances in a form that retains actual monetary value.

91.     Defendant's online casino platform—Stake.us—is an Internet site that permits consumers to play games of chance (*e.g.*, online slot machines) for money or other things of value (Stake Cash).

92.     Every casino game offered on Defendant's online platform is a "gambling device" because they accept money or other valuable items (Stake Cash) from players, operate on chance using random number generators, and enable players to stake, hazard, and bet money or other valuable items (Stake Cash) with the potential to win or lose money or other valuable items (Stake Cash).

93.     Defendant's games of chance do not permit players to gamble directly against other players. Rather, like the "house" in a traditional brick-and-mortar casino, Defendant is the "winner" under the statute because it has a direct stake in the result of the gambling. When players wager Stake Cash on games of chance and win, they can redeem their winnings for cryptocurrency at a 1:1 ratio with the U.S. Dollar—meaning Defendant incurs the equivalent monetary loss. Conversely, when players bet Stake Cash on games of chance and lose, Defendant retains the full value of the lost Stake Cash, just as traditional casinos profit from losing bets placed against the house.

94.     By wagering and losing Stake Cash on Defendant's casino platform, Plaintiff and each member of the Illinois Loss Recovery Subclass gambled and lost money or things of value.

95.     Plaintiff and the members of the Illinois Loss Recovery Subclass have each lost more than $50 gambling on Defendant's platform.

96.     Defendant owns, operates, and controls the gambling games described herein, and directly profited from Plaintiff's and the Illinois Loss Recovery Subclass members' gambling losses. Defendant is therefore the "winner" under 720 ILCS 5/28-8(a) of all moneys lost by

Plaintiff and the Illinois Loss Recovery Subclass members.

97.     Plaintiff's and the Illinois Loss Recovery Subclass members' losses occurred in Illinois because Defendant's online casino games were played by Illinois residents on computers, mobile phones, and mobile devices in the State of Illinois. Defendant had actual knowledge that Plaintiff and the Illinois Loss Recovery Subclass members reside in Illinois because each of them selected "Illinois" as their state of residence and provided their complete home address pursuant to Defendant's mandatory registration process.

98.     Plaintiff, on behalf of himself and the Illinois Loss Recovery Subclass members, seek an order requiring Defendant to (1) cease the operation of its gambling devices, and (2) return all lost monies, with costs, pursuant to 720 ILCS 5/28-8(a).

**SECOND CAUSE OF ACTION**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS §§ 505/1,** *et seq.*
**(On behalf of Plaintiff and the Illinois Class)**

99.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

100.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1, *et seq.*, protects consumers and competitors by promoting fair competition in commercial markets for goods and services.

101.    The ICFA prohibits any unlawful, unfair, or fraudulent business acts or practices including the employment of any deception, fraud, false pretense, false promise, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact.

102.    The ICFA applies to Defendant's actions and conduct as described herein because it protects consumers in transactions that are intended to result, or which have resulted, in the sale of goods or services.

103.    Defendant is a "person" as defined by 815 ILCS 505/1(c).

104.     Plaintiff and the Illinois Class are "consumers" under 815 ILCS 505/1(e).

105.     Stake Cash is "merchandise" within the meaning of 815 ILCS 505/1(b) and Defendant's sale of Stake Cash constitutes "trade" or "commerce" within the meaning of 815 ILCS 505/1(f).

106.     Defendant's practices described above, including their operation of illegal casino platform and sale of Stake Cash, were unfair within the meaning of the ICFA because they offended Illinois' public policy against unlawful and unregulated gambling, *see, e.g.*, 720 ILCS 5/28-7 (Gambling contracts void); *Hall v. Montaleone*, 348 N.E.2d 196, 198 (Ill. App. Ct. 1976) (stating that "gambling contracts or contracts for an immoral or criminal purpose" are "absolutely void and unenforceable" by reason of "public policy"), and were otherwise unethical, oppressive, and unscrupulous and caused substantial injury to the consumers who purchased Stake Cash on the Stake Casino platform.

107.     Defendant caused substantial injury to Plaintiff and the Illinois Class by inducing them to purchase and wager Stake Cash through the design of its illegal gambling platform. The injury caused by Defendant's conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

108.     Defendant's unfair practices occurred during the marketing and sale of Stake Cash for use on Stake's illegal gambling platform, and thus, occurred in the course of trade and commerce.

109.     Defendant represents to consumers, including Plaintiff and the Illinois Class, that its "**PLATFORM AND GAMES DO NOT OFFER REAL MONEY GAMBLING**" (emphasis in original) and misleads consumers into believing they are not engaging in gambling

31

by wagering Stake Cash on the casino games offered on its platform. Defendant even represents to consumers, including Plaintiff and the Illinois Class, that its "social casino has been tailor-made to provide *the ultimate social, safe and free gaming experience*." (emphasis added).

110.    Further, Defendant conceals from consumers, including Plaintiff and the Illinois Class, that wagering with Stake Cash on its platform constitutes illegal gambling prohibited by state law.

111.    To make matters worse, Defendant's casinos fail to provide the statutorily required consumer protections that every licensed casino in the State of Illinois must provide. For example, Defendant disregards the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the Illinois Gaming Board Self-Exclusion Program. *See* 230 ILCS 10/13.1(a) (Compulsive gambling) ("Each licensed owner shall post signs with a statement regarding obtaining assistance with gambling problems" at "[e]ach entrance and exit" and "[n]ear each credit location."); 11 Ill. Admin. Code 1800.1750.

112.    Defendant aggressively markets and advertises its platform on social media while at the same time concealing that it is illegal under state law. As such, Illinois consumers, including Plaintiff and the Illinois Class, are highly likely to continue to encounter current and future iterations of Defendant's illegal platform absent injunctive relief.

113.    Not only is Defendant's conduct unfair, but as discussed above, Defendant's conduct is also unlawful given that they knowingly maintain and operate "an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of the Internet," 720 ILCS 5/28-1(a)(12), and otherwise knowingly play games of chance for money or other things of value, 720 ILCS 5/28-1(a)(1), and knowingly use gambling devices, 720 ILCS

5/28-1(a)(3).

114. Further, Defendant's conduct is immoral because it is designed to encourage illegal gambling while marketing its platform as a legal simulation of casino-style games, as well as to exploit psychological triggers associated with gambling and addiction in order to target susceptible populations.

115. As a direct and proximate result of Defendant's violations of the ICFA, Plaintiff and the Illinois Class members have suffered harm in the form of monies paid and lost for Defendant's Stake Cash.

116. Plaintiff, on behalf of himself and the Illinois Class members, seek an order requiring Defendant to (1) cease the unfair practices described herein, (2) return all monies acquired through any purchase that included the transfer of Stake Cash to Plaintiff and the Illinois Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment**
**<u>(On Behalf of Plaintiff and the Illinois Class)</u>**

117. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

118. Plaintiff and the Illinois Class members have conferred a benefit upon Defendant in the form of the money they paid for the purchase of Stake Cash to wager on Defendant's illegal casino platform.

119. Defendant appreciates and has knowledge of the benefits conferred upon it by Plaintiff and the Illinois Class.

120. Under principles of equity and good conscience, Defendant should not be permitted to retain the money obtained from Plaintiff and the Illinois Class members, which

Defendant has unjustly obtained as a result of its unlawful operation of casino games. As it stands, Defendant has retained millions of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

121.     Accordingly, Plaintiff and the Illinois Class members seek full disgorgement of all money Defendant has retained as a result of the wrongful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brayden Urdan, individually and on behalf of the Classes, respectfully requests that this Court enter an Order:

(a)     Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiff as the representative of the Classes, and appointing his counsel as Class Counsel;

(b)     Declaring that Defendant's conduct, as set out above, is unlawful under 720 ILCS 5/28-8 and 815 ILCS 505/1, *et seq.*;

(c)     Entering judgment against Defendant in the amount of the losses suffered by Plaintiff and each member of the Classes;

(d)     Enjoining Defendant from continuing the challenged conduct;

(e)     Awarding damages to Plaintiff and the members of the Classes in an amount to be determined at trial, including trebling as appropriate;

(f)     Awarding restitution to Plaintiff and the members of the Classes in an amount to be determined at trial;

(g)     Requiring disgorgement of all of Defendant's ill-gotten gains;

(h)     Awarding reasonable attorneys' fees and expenses;

(i)     Awarding pre- and post-judgment interest, to the extent allowable;

(j)     Requiring injunctive and/or declaratory relief as necessary to protect the interests of Plaintiff and the Classes; and

(k)     Awarding such other and further relief as equity and justice require, including all forms of relief provided for under Plaintiff's claims.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**BRAYDEN URDAN,** individually and on behalf of all others similarly situated,

Dated: April 7, 2025                    By: */s/ J. Eli Wade-Scott*
                                        One of Plaintiff's Attorneys

                                        J. Eli Wade-Scott
                                        ewadescott@edelson.com
                                        Michael Ovca
                                        movca@edelson.com
                                        Hannah Hilligoss
                                        hhilligoss@edelson.com
                                        Ari J. Scharg
                                        ascharg@edelson.com
                                        EDELSON PC
                                        350 North LaSalle Street, 14th Floor
                                        Chicago, Illinois 60654
                                        Tel: 312.589.6370
                                        Fax: 312.589.6378

                                        *Counsel for Plaintiff and the Putative Classes*