**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| BRAYDEN URDAN, individually and on behalf of all others similarly situated, | Case No.: 1:25−cv−03736 |
| *Plaintiff*, | Hon. Jorge L. Alonso |
| v. | |
| SWEEPSTEAKS LIMITED d/b/a STAKE.US, | |
| *Defendant*. | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
<u>MOTION TO COMPEL ARBITRATION</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................2

ARGUMENT ...................................................................................................................4

I.  STAKE HAS FAILED TO MEET ITS BURDEN TO ESTABLISH THE
    EXISTENCE OF AN AGREEMENT TO ARBITRATE ...............................................4

II. THE ARBITRATION CLAUSE AND DELEGATION CLAUSE ARE
    UNCONSCIONABLE AND, THEREFORE, UNENFORCEABLE ........................10

    A.  The Arbitration Clause is Unconscionable ..........................................10

        1.  The arbitration agreement is substantively unconscionable...............10

            a.  Stake's terms are fundamentally "one-sided" and
                "imbalanced" because they cause undue delay and require
                arbitrations to proceed individually and confidentially .........10

            b.  Stake manufactures "cost-price disparity" via collective action
                waivers and liability limits .............................................13

        2.  The arbitration agreement is procedurally unconscionable...............16

    B.  The Court—Not an Arbitrator—Decides Unconscionability Because the
        Delegation Clause itself is Unconscionable ........................................19

CONCLUSION ...............................................................................................20

# TABLE OF AUTHORITIES

**U.S. Supreme Court Cases**

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)................................................................................4, 16

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022)........................................................................................16

*Rent-A-Ctr., W., Inc. v. Jackson*,
561 U.S. 63 (2010)..........................................................................................20

*Walters v. Nat'l Ass'n of Radiation Survivors*,
473 U.S. 305 (1985)........................................................................................12

**U.S. Court of Appeals Cases**

*Domer v. Menard, Inc.*,
116 F.4th 686 (7th Cir. 2024) .........................................................................4

*Faulkenberg v. CB Tax Franchise Sys., LP*,
637 F.3d 801 (7th Cir. 2011) ..........................................................................4

*Freeman v. Chicago Musical Instrument Co.*,
689 F.2d 715 (7th Cir. 1982) ........................................................................12

*Jackson v. Payday Fin., LLC*,
764 F.3d 765 (7th Cir. 2014) ........................................................................17

*K.F.C. v. Snap Inc.*,
29 F.4th 835 (7th Cir. 2022) ...........................................................................4

*Rodgers-Rouzier v. Am. Queen Steamboat Operating Co., LLC*,
104 F.4th 978 (7th Cir. 2024) .........................................................................4

*Sgouros v. TransUnion Corp.*,
817 F.3d 1029 (7th Cir. 2016) ..................................................................5, 8, 9

*Shockley v. PrimeLending*,
929 F.3d 1012 (8th Cir. 2019) ........................................................................8

*Tinder v. Pinkerton Sec.*,
305 F.3d 728 (7th Cir. 2002) ......................................................................4, 5

*Wallrich v. Samsung Elecs. Am., Inc.*,
    106 F.4th 609 (7th Cir. 2024) ...................................................................................5

**U.S. District Court Cases**

*Angelilli v. Activision Blizzard, Inc.*,
    No. 23-CV-16566, 2025 WL 524276 (N.D. Ill. 2025) ..............................................7, 8

*Fahy v. Minto Dev. Corp.*,
    722 F. Supp. 3d 784 (N.D. Ill. 2024) ....................................................................10, 20

*Gilbert v. I.C. Sys., Inc.*,
    No. 19-CV-04988, 2021 WL 292852 (N.D. Ill. Jan. 28, 2021) ....................................6

*Hoganberry v. Experian Info. Sols., Inc.*,
    703 F. Supp. 3d 854 (N.D. Ill. 2023) ..........................................................................9

*Johnson v. Hum. Power of N Co.*,
    767 F. Supp. 3d 845 (N.D. Ill. 2025) ..........................................................................9

*Johnson v. Uber Techs., Inc.*,
    No. 16 C 5468, 2017 WL 1155384 (N.D. Ill. 2017) ...............................................4, 5, 6

*Kater v. Churchill Downs Inc.*,
    423 F. Supp. 3d 1055 (W.D. Wash. 2019) ..................................................................17

*MacClelland v. Cellco P'ship*,
    609 F. Supp. 3d 1024 (N.D. Cal. 2022) ................................................................11, 13

*Melvin v. Big Data Arts, LLC*,
    553 F. Supp. 3d 447 (N.D. Ill. 2021) ...........................................................................6

*Pandolfi v. AviaGames, Inc.*,
    No. 23-CV-05971-EMC, 2024 WL 4051754 (N.D. Cal. 2024) ......................12, 13, 20

*Sanchez v. CleanNet USA, Inc.*,
    78 F. Supp. 3d 747 (N.D. Ill. 2015) ...........................................................................19

*Valentine v. Wideopen W. Fin., LLC*,
    No. 09 C 07653, 2012 WL 1021809 (N.D. Ill. 2012) ................................................16

*Van Tassell v. United Mktg. Grp., LLC*,
    795 F. Supp. 2d 770 (N.D. Ill. 2011) ...........................................................................7

*Williams v. TCF Nat'l Bank*,
    No. 12 C 05115, 2013 WL 708123 (N.D. Ill. 2013) ...................................................17

*Wilson v. Redbox Automated Retail, LLC*,
　　448 F. Supp. 3d 873 (N.D. Ill. 2020) ................................................................5, 6 , 7

**State Court Cases**

*Arbogast v. Chicago Cubs Baseball Club, LLC*,
　　2024 IL App (1st) 230361-U ...............................................................................18

*Bain v. Airoom*,
　　2022 IL App (1st) 211001.........................................................................13, 14, 19

*Copper Bend Pharmacy, Inc. v. OptumRx*,
　　2023 IL App (5th) 220211-U ................................................................................17

*Gaines v. Ciox Health, LLC*,
　　2024 IL App (5th) 230565 .......................................................................................6

*Geller v. Uber Techs., Inc.*,
　　2025 IL App (1st) 241458-U ................................................................................20

*Hwang v. Pathway LaGrange Prop. Owner, LLC*,
　　2024 IL App (1st) 240534..........................................................................13, 15, 19

*Keefe v. Allied Home Mortg. Corp.*,
　　393 Ill. App. 3d 226 (2009) .................................................................................16

*Kinkel v. Cingular Wireless LLC*,
　　223 Ill. 2d 1 (2006) ...................................................................................... *passim*

*Razor v. Hyundai Motor Am.*,
　　222 Ill. 2d 75 (2006) ...........................................................................................15

*Turner v. Concord Nursing & Rehab. Ctr., LLC*,
　　2023 IL App (1st) 221721....................................................................... *passim*

*Wigginton v. Dell, Inc.*,
　　382 Ill. App. 3d 1189 (2008) ...............................................................................15

*Willis v. Captain D's, LLC*,
　　2015 IL App (5th) 140234-U ...............................................................................14

*Zuniga v. Major League Baseball*,
　　2021 IL App (1st) 201264......................................................................................18

**Secondary Sources**

American Arbitration Association, Consumer Arbitration Rules and Mediation Procedures (Jan. 15, 2024), https://www.adr.org/media/3uofn4lu/consumer_rules_and_mediation_procedures_feeschedule.pdf ........................................................................................................15

BLACK'S LAW DICTIONARY (12th ed. 2024) ........................................................8

**Statutes**

9 U.S.C. § 4 ........................................................................................................5

720 ILCS 5/28-8 ................................................................................................2

815 ILCS 505/1 ..................................................................................................2

## INTRODUCTION

Plaintiff Brayden Urdan ("Plaintiff") brought this action alleging that Defendant Sweepsteaks Limited d/b/a Stake.us ("Stake") preys on consumers through addictive and illegal online gambling falsely marketed as free-to-play "sweepstakes." Plaintiff seeks relief under Illinois law for himself and a class of other consumers who lost money at Stake's casinos.

Rather than defend its conduct on the merits, Stake is trying to enforce an arbitration agreement that it can't even prove Plaintiff agreed to. Stake has provided no screenshots and very little substantive description of the web pages it contends Plaintiff clicked through to agree to Stake's terms—and it has admitted that it is *impossible* for it to provide this information.

Even if an agreement to arbitrate does exist, it is unconscionable and, therefore, unenforceable. Stake has tried to rig an arbitration process that not only ensures that no one can get relief but prevents injured consumers from choosing their own counsel. To illustrate, Stake's arbitration provision prohibits two users with similar claims and coordinating counsel from proceeding at the same time, forcing each user to wait in line. With over 1,000 users in Illinois, alone, the last of these users would be waiting *centuries* to have their claims heard. What's more, Stake prohibits class or mass action, limits damages to those incurred thirty days prior to filing a claim, and bars recovery of punitive damages and attorneys' fees—likely meaning any relief recoverable in arbitration would be overshadowed by the costs of arbitration. Stake's arbitration process is a get-out-of-jail-free card dressed up as dispute resolution, and the Court should not condone it. Stake's motion should be denied.[1]

---

[1] On August 5, 2025, Plaintiff submitted an unopposed motion to file a twenty-page brief, (dkt. 23), which is pending before the Court. Plaintiff will re-submit a fifteen-page brief if that motion is denied.

## BACKGROUND

Stake.us is the United States arm of the profitable online casino Stake.com. (Dkt. 1 ("Compl.") ¶ 1.) Plaintiff Urdan was a Stake.us user in Illinois. (*Id.* ¶¶ 9, 71-74.) On Stake.us, users can buy and wager coins that can be redeemed for real money at a 1:1 exchange rate to the U.S. Dollar. (*Id.* ¶ 34.) Plaintiff alleges that Stake's online casino constitutes illegal gambling falsely marketed as free-to-play "sweepstakes." (*Id.* ¶¶ 1-4, 33-43.) On behalf of an Illinois class and a subclass, he seeks recovery of the money he lost wagering at Stake's illegal online casino under the Illinois Loss Recovery Act, 720 ILCS 5/28-8, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*., and under common law principles of unjust enrichment. (Compl. ¶¶ 83-121.)

To play Stake's casino games, users must sign up for a Stake.us account. (*See* dkt. 13-1 ("Craven Decl.") ¶ 7.) Stake contends that, to create an account, users must click a checkbox that appears next to text that reads "By clicking the checkbox, you are indicating that you have read and acknowledge the Terms & Conditions." (*Id.* ¶ 9.) Stake claims that the phrase "Terms & Conditions" was hyperlinked in text that appeared in a different color than the rest of the statement. (*Id.*) Stake also contends that it displayed a "mandatory acceptance window" to Plaintiff on May 17, 2023, which displayed the terms and included some type of checkbox that users had to click to enter the site. (*Id.* ¶ 17.) Stake does not include what text appeared next to the checkbox and does not provide any other details about the screen's layout. (*Id.*)

According to Stake's records, Plaintiff used the Stake.us platform from August 23, 2022, when he signed up, through April 2, 2025. (*Id.* ¶ 6.) Stake suspended Plaintiff's account on April 3, 2025, in response to Plaintiff notifying Stake of this dispute. (Compl. ¶ 74 n.4.) There were different versions of the Terms and Conditions in place at different times, (*see* Craven Decl. ¶¶

11-15), but all versions in place during Plaintiff's use of Stake.us contained a substantially

similar arbitration clause.[2] The arbitration provision states that:

> By agreeing to these Terms and Conditions, both you and Stake agree that any and all Disputes, including without limitation any question regarding the existence, validity, enforceability, or termination of these Terms and Conditions and/or this clause 26 (Dispute Resolution and Agreement to Arbitrate), shall be referred to and finally resolved by arbitration administered by the American Arbitration Association (AAA), the Rules of which are deemed to be incorporated by reference into this clause.

(T&C § 26.6(a).) The terms prohibit claims brought as "a Collective Action," explaining that:

> a claim to resolve a Dispute against Stake will be deemed a Collective Action if: a. claims are filed or pursued concurrently by or on behalf of two or more persons; and b. counsel for the two or more persons is the same, or share fees, or coordinate in any way . . . For the purposes of this clause, the term 'concurrently' means that the claims are pending (filed but not resolved) at the same time.

(*Id.* § 26.7(a)-(b).) The provision also states that "AAA RULES REFERENCED ABOVE

SHALL EXCLUDE ANY RULES OR PROCEDURES GOVERNING OR PERMITTING

COLLECTIVE ACTIONS (AS DEFINED ABOVE) OF ANY KIND." (*Id.* § 26.8.)

The Terms and Conditions purportedly limit Stake's liability to "THE AMOUNT YOU

HAVE PAID US IN THE THIRTY (30) DAYS IMMEDIATELY PRECEDING THE DATE

ON WHICH YOU FIRST ASSERT ANY SUCH CLAIM PURSUANT TO [the arbitration

clause]." (*Id.* § 24.2(b).) And it bars recovery for punitive damages and attorneys' fees. (*Id.* §

24.2(a), 24.1(a).)

The only substantive difference between the arbitration provisions across the relevant

versions of Stake's Terms & Conditions is the addition of an opt-out provision in the August 23,

---

[2]     Plaintiff cites to the July 25, 2022 version of the Terms and Conditions (Dkt. 13-2), which were in place at the time Stake contends Plaintiff signed up, unless otherwise specified. Citations to the Terms and Conditions will be in the form "T&C § __." Stake cites to various versions of its terms throughout its motion, including those in place after Plaintiff's account was suspended. (*See* Mot. at 2, 9 (citing April 7, 2025 terms).) It's not clear how Stake contends these later versions apply, but they do not, as Plaintiff last logged into his account on April 2, 2025. (Craven Decl. ¶ 6.)

3

2024 version. (Dkt. 13-4 § 26.9.) The provision provides that users may opt out of arbitration if they mail a letter to a Washington, D.C. address within thirty days of creating an account or by August 23, 2024, whichever is later. (*Id.*) In other words, if a user didn't log in to Stake between August 23, 2024 and September 22, 2024, they would have had no opportunity to opt out. Furthermore, Stake does not contend that it notified users of this update to its terms.

Stake moved to compel arbitration and to stay the litigation on July 8, 2025. (Dkt. 12.)

## ARGUMENT

Stake's motion to compel arbitration should be denied for two independent reasons: First, there is no agreement to arbitrate. Second, even if there was a valid agreement to arbitrate, both the delegation clause and the arbitration clause are unconscionable and unenforceable.

## I.    STAKE HAS FAILED TO MEET ITS BURDEN TO ESTABLISH THE EXISTENCE OF AN AGREEMENT TO ARBITRATE.

The Supreme Court has repeatedly emphasized that arbitration is a creature of contract.[3] *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). "Whether an agreement to arbitrate has been formed is governed by state-law principles of contract formation."[4] *Domer v. Menard, Inc.*, 116 F.4th 686, 694 (7th Cir. 2024). Whether parties have agreed to arbitrate is determined "under a quasi-summary judgment standard." *Johnson v. Uber Techs., Inc*., No. 16 C 5468, 2017 WL 1155384, at *2 (N.D. Ill. Mar. 13, 2017) (citing *Tinder v. Pinkerton Sec*., 305 F.3d 728, 735 (7th Cir. 2002)). The party seeking to compel arbitration bears the initial burden of

---

[3]    It is black-letter law that the existence of an agreement to arbitrate cannot be delegated to the arbitrator. *See K.F.C. v. Snap Inc*., 29 F.4th 835, 837 (7th Cir. 2022). While Stake's arbitration provision purports to delegate the "existence" of an agreement to arbitrate, (Mot. at 8-9), Stake does not seem to pursue any argument that the arbitrator should decide this issue—nor could they.

[4]    Stake cites to Illinois law throughout its motion, (*see generally* dkt. 13), and Plaintiff agrees that Illinois law governs. Accordingly, the Court should apply Illinois law. *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809 (7th Cir. 2011), *abrogated on other grounds by Rodgers-Rouzier v. Am. Queen Steamboat Operating Co., LLC*, 104 F.4th 978, 984 (7th Cir. 2024) ("In the absence of [a request to the contrary], we apply Illinois law" to the question whether the parties agreed to arbitrate).

establishing the existence of an agreement to arbitrate. *Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 618 (7th Cir. 2024). If they do, the burden shifts to the party resisting arbitration to identify a triable issue of fact as to the purported agreement. *Johnson*, 2017 WL 1155384, at *2. Finally, "[i]f the party opposing arbitration demonstrates that there is a genuine issue of material fact concerning the existence of an agreement to arbitrate, the issue shall proceed to trial." *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 880 (N.D. Ill. 2020) (quoting 9 U.S.C. § 4). "[T]he Court must accept the non-movant's evidence as true and draw all reasonable inferences in [their] favor." *Id.* (citing *Tinder*, 305 F.3d at 735). Here, Stake fails at the first step because it has not presented sufficient evidence that an agreement to arbitrate exits.

First, Stake has provided no screenshots of the webpages that it contends contained clickwrap requiring users to agree to the arbitration clause in its Terms and Conditions; its declaration alone is insufficient. Stake asserts that Plaintiff agreed to arbitrate by assenting to Stake's terms through clickwrap agreements (1) on August 23, 2022 when he signed up for its service, and (2) on May 17, 2023 when Stake displayed a "mandatory acceptance window" to him. (Craven Decl. ¶¶ 9, 17.) "There is nothing automatically offensive about such [clickwrap] agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033-34 (7th Cir. 2016). But as the Seventh Circuit has explained, whether a user has agreed to online terms of use—through clickwrap or otherwise—is a fact-intensive inquiry:

> [W]e might ask whether the web pages presented to the consumer adequately communicate all the terms and conditions of the agreement, and whether the circumstances support the assumption that the purchaser receives reasonable notice of those terms. This is a fact-intensive inquiry: we cannot presume that a person who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.) Indeed, a person using the internet may not realize that she is agreeing to a contract at all[.]

*Id.* at 1034-35.

Stake gives this fact-intensive inquiry short shrift. Stake's only supporting evidence—Mr. Craven's declaration—consists almost entirely of conclusory statements simply asserting that Mr. Urdan agreed to the terms instead of supporting facts. (*See* Craven Decl. ¶¶ 8-10, 17.) It doesn't, for example, contain a single screenshot depicting what the sign-up page (the "Sign-up Page") or the "mandatory acceptance window" (the "Notification Page") actually looked like when Mr. Urdan saw them. (*Id.*) This is insufficient to meet Stake's burden because "[t]he presentation of the online agreement matters: Whether there was notice of the existence of additional contract terms presented on a webpage depends heavily on whether the design and content of that webpage rendered the existence of the terms reasonably conspicuous." *Wilson*, 448 F. Supp. 3d at 883. Stake's conclusory declaration leaves the Court guessing at these foundational elements of clickwrap agreements.

Numerous courts have held that threadbare evidence like that provided by Stake here fails to satisfy the initial burden of establishing an agreement to arbitrate. *See Gaines v. Ciox Health, LLC*, 2024 IL App (5th) 230565; *Gilbert v. I.C. Sys., Inc.*, No. 19-CV-04988, 2021 WL 292852, at *8 (N.D. Ill. Jan. 28, 2021) (denying motion to compel because defendant's declaration failed to describe how user agreed to terms); *Johnson*, 2017 WL 1155384, at *2 (denying motion to compel because defendant's declaration failed to provide sufficient information about registration system at time plaintiff registered); *Melvin v. Big Data Arts, LLC*, 553 F. Supp. 447, 450-51 (N.D. Ill. 2021) (similar). In *Gaines*, for example, the Illinois appellate court held that the defendant had not met its burden of showing an agreement to arbitrate existed in part because the defendant "did not produce any documents or screen shots to replicate the self-registration process." 2024 IL App (5th) 230565, ¶ 30. Furthermore, the court noted that the only

evidence provided were two declarations stating that the plaintiff would have accepted the terms and conditions by clicking an "I accept" button, but did not indicate whether the declarants "had any education, training, or experience regarding [defendant's] online portal generally, or the 2019 version of online self-registration process." *Id.* ¶ 31. Similarly, here, Stake has not provided any screenshots of the Sign-up Page or the Notification Page, nor does Mr. Craven have any particular knowledge regarding Stake's Sign-up Page in 2022 or the Notification Page in 2023.

To be sure, Stake does provide some description of the Sign-up Page, stating generally that new users must click a checkbox that appears next to the following statement: "By clicking the checkbox, you are indicating that you have *read and acknowledge* the Terms & Conditions."[5] (Craven Decl. ¶ 9 (emphasis added).) Stake asserts that the phrase "Terms & Conditions" "was hyperlinked in text that appeared in a different color than the rest of the statement." (Craven Decl. ¶ 9.) But there's no indication of the font, how close the disclosure actually was to the checkbox, the color of the primary text, the color of the background, the color of the phrase "Terms & Conditions," or whether any of these colors were actually contrasting. In any event, "[u]sing a different color for the hyperlink from the surrounding text, by itself, is not sufficient to render the hyperlink reasonably conspicuous." *Wilson*, 448 F. Supp. 3d at 885. Stake provides no description of what, if any, text appeared next to the checkbox on the Notification Page. (Craven Decl. ¶ 17.) Even in the cases Stake cites for support, the courts conducted detailed reviews of the at-issue web pages to determine reasonable notice and assent. *See Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 792-793 (N.D. Ill. 2011) (describing review of webpage); *Angelilli v. Activision Blizzard, Inc*., No. 23-CV-16566, 2025 WL 524276, at *16-18 (N.D. Ill.

---

[5]    Notably, Stake's motion misquotes the text, deceptively representing that it says "I have read and *agree* to the terms and conditions." (Mot. at 3 (emphasis added) (misquoting Craven Decl. at ¶ 9).)

Feb. 18, 2025) (including screenshots of the relevant webpage). Stake hasn't given the Court sufficient information to do that here.

In any event, the text next to the checkbox does not manifest an intent to be bound by the terms. Clickwraps are only enforceable if the website "provide[s] a user reasonable notice that his use of the site or click on a button constitutes *assent* to an agreement." *Sgouros*, 817 F.3d at 1036 (emphasis added). But notifying a user that clicking a checkbox indicates that he has "read and acknowledge[d]" the terms is not the same as notifying the user that clicking the checkbox indicates an agreement to be bound by the terms. "Acknowledge" means "[t]o recognize (something) as being factual or valid." Acknowledge, BLACK'S LAW DICTIONARY (12th ed. 2024). Whereas "assent" means "[a]greement, approval, or permission." Assent, BLACK'S LAW DICTIONARY (12th ed. 2024). A user could very well acknowledge the existence of terms without agreeing to be bound by them.

The Eighth Circuit has recognized this difference. In *Shockley v. PrimeLending*, the court considered whether an employee accepted the terms in an employee handbook containing an arbitration clause when a computer-generated pop-up advised her "that by entering into the system she thereby *acknowledged* her review of [the handbook]." 929 F.3d 1012, 1019 (8th Cir. 2019) (emphasis added). The court held that she did not accept the terms because "at best" she "acknowledged the existence of the [terms]," rejecting the proposition that an "employee's general knowledge or awareness of the existence of a contract constitutes the positive and unambiguous unequivocal acceptance" required by law. *Id.* Stake does not cite any cases upholding clickwraps with similar language. [6]

---

[6] The only clickwrap case Stake cites is inapposite because the user had to click a button labeled "Accept" in order to continue. *Angelilli*, 2025 WL 524276, at *16-18.

"The phrasing of the disclosure is particularly important given that Defendant has complete control over the language of its own website and could have written the disclosure in any way." *Johnson v. Hum. Power of N Co.*, 767 F. Supp. 3d 845, 851–52 (N.D. Ill. 2025). Providing a user with reasonable notice "is not hard to accomplish[;]" a website could bind users by placing "a clearly labeled hyperlink to the agreement, next to an 'I Accept' button that unambiguously pertains to that agreement." *Sgouros*, 817 F.3d at 1036. Stake could have easily said "by clicking the checkbox, you are indicating that you have read and *agree* to the Terms & Conditions." "[T]he onus was on [Stake] to make clear that a consumer was assenting to the terms by clicking the button; but it did not." *Johnson*, 767 F. Supp. 3d at 852.

Furthermore, Stake has admitted that it is incapable of providing the information necessary to establish assent. Plaintiff asked Stake for screenshots of the Sign-up Page at the time Plaintiff created an account, in addition to any communications or notifications Stake sent Plaintiff notifying him of updated terms. (*See* Ex. 1 at 1.) In response, Stake's counsel represented that "[t]echnical limitations prevent us from producing screenshots of the sign-up workflow at the time Plaintiff created his account," and that similar limitations "prevent us from retrieving information regarding communications or other notifications informing Plaintiff of updated terms." (*Id.* at 8.) In fact, it appears that Stake's engineering team was not even able to launch the versions of the relevant web pages in place at the time Plaintiff saw them. (*Id.* at 18.) This raises serious concerns about what Mr. Craven's description of the Sign-up Page and Notification Page was based on, considering that he wasn't able to see the actual web pages.[7]

---

[7]     Should the Court find that Stake has met its initial burden of establishing assent, Plaintiff requests leave to take a limited deposition of Mr. Craven to probe the contentions in his declaration. *See Hoganberry v. Experian Info. Sols., Inc.*, 703 F. Supp. 3d 854, 862 (N.D. Ill. 2023) (granting discovery into disputed issue of formation).

II.     **THE ARBITRATION CLAUSE AND DELEGATION CLAUSE ARE UNCONSCIONABLE AND, THEREFORE, UNENFORCEABLE.**

Stake's arbitration clause is unenforceable because it is unconscionable. Moreover, this Court—not an arbitrator—must decide the issue of unconscionability.

### A.     The Arbitration Clause is Unconscionable.

Under Illinois law, a contract can be found unconscionable on "either procedural or substantive grounds." *Fahy v. Minto Dev. Corp.*, 722 F. Supp. 3d 784, 804 (N.D. Ill. 2024); *Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 21 (2006) ("reject[ing] the requirement that both procedural and substantive unconscionability must be found before a contract or a contract provision will be found to be unenforceable"). Stake's arbitration agreement is guilty of both.

### 1.     The arbitration agreement is substantively unconscionable.

Illinois courts assess substantive unconscionability on a "case-by-case basis, considering the totality of the circumstances," *Kinkel*, 223 Ill. 2d at 42–43, evaluating whether a contract's terms are "so one-sided that they oppress or unfairly surprise an innocent party[;]" create an "overall imbalance in the obligations and rights imposed by the bargain[;]" or demonstrate "significant cost-price disparity." *Turner v. Concord Nursing & Rehab. Ctr., LLC*, 2023 IL App (1st) 221721, ¶ 20, *appeal denied*, 221 N.E.3d 347 (Ill. 2023). The arbitration clause's most troubling components individually raise doubts about the contract's fairness under this standard. Collectively, they prevent plaintiffs from seeking redress, immunizing Stake from liability.

### a.     Stake's terms are fundamentally "one-sided" and "imbalanced" because they cause undue delay and require arbitrations to proceed individually and confidentially.

Stake's most burdensome provisions disproportionately curtail the rights of claimants and benefit Stake. For example, Stake's bar on collection arbitrations means that most claimants will be forced to wait literal lifetimes to even file a claim—significantly reducing the number of

claims that Stake must contend with and preventing recovery for many users. Stake requires plaintiffs to arbitrate "in an individual capacity only" and bars them from "bring[ing] a Dispute as a Collective Action," defined to include claims "filed or pursued concurrently by or on behalf of two or more persons" where "counsel for the two or more persons is the same, or share fees, or coordinate in any way." (T&C §§ 26.7(a)–(b).) Thus, if Mr. Urdan initiated an arbitration against Stake, another claimant could not initiate one until Mr. Urdan's arbitration was complete (unless that plaintiff secured different, independent counsel and in no way coordinated with Mr. Urdan, an expensive and unlikely scenario as discussed below).

The effect of this restriction is to delay arbitration into perpetuity, unreasonably burdening "an individual customer's ability to vindicate [their] claims." *Kinkel*, 223 Ill. 2d at 42. The American Arbitration Association estimates that the "average disposition time for an arbitration takes a little under seven months." *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1040 (N.D. Cal. 2022). That unnecessary delay is bad enough, but Plaintiff alleges that there are "thousands of consumers" with similar claims just in Illinois. (Compl. ¶ 76.) Conservatively assuming there were only one thousand claimants, if each of those users had to arbitrate their claims sequentially, they would have to wait over 580 years to be heard. This delay benefits Stake, as many would-be claimants would die before they reached the front of the line. Such a delay is surely "so one-sided as to oppress[es] or unfairly surprise[s]" the average user, and no reasonable consumer would knowingly agree to a dispute resolution process requiring them to wait centuries for their day in arbitration. *Kinkel*, 223 Ill. 2d at 28.

Similar—but less restrictive—arbitration provisions have been held unconscionable. In *MacClelland*, for example, an arbitration agreement provided that only ten claimants raising similar claims and represented by the same counsel could be arbitrated at a time. 609 F. Supp. 3d

11

at 1040. Assuming seven-month arbitrations, "it would take approximately 156 years to resolve the claims of all of Plaintiffs' counsel's clients." *Id.* The court held that requiring plaintiffs "to wait months, more likely years before they can even submit a demand for arbitration [was] 'unreasonably favorable' to [defendant]" and therefore unconscionable. *Id.* at 1042. Likewise, in *Pandolfi v. AviaGames, Inc.*, the court found an arbitration clause unconscionable where arbitration of similar claims brought by claimants represented by coordinated counsel was limited to twenty cases at a time. No. 23-CV-05971-EMC, 2024 WL 4051754, at *6 (N.D. Cal. Sept. 4, 2024). As that court noted, "[the] prospect of delay . . . has a chilling effect on [claimants], deterring them from vindicating their rights." *Id.*; *see also Kinkel*, 223 Ill. 2d at 28. Stake's limitation to only one case at a time is far more restrictive.

Perhaps even more troubling is that Stake wants to choose counsel for its opposition and effectively ensures that there will be no counsel at all. Courts similarly find this unconscionable: it "affects the right to counsel of their choice or indeed, the ability to find any counsel at all: where the individual claims are small (as consumer claims often are), it may be difficult to find an attorney who represents only a single or small number of similarly situated clients." *Pandolfi*, 2024 WL 4051754, at *11. "[T]he practical reality is that claims based on a company-wide policy affecting consumers will often be brought by law firms that represent a multitude of claimants, especially when the dollar amounts are small." *Id.* at *6. Accordingly, Stake's arbitration provisions effectively "depriv[es] [Plaintiff] of representation of their own choosing." *Freeman v. Chicago Musical Instrument Co*., 689 F.2d 715, 721 (7th Cir. 1982); *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 368 n.16 (1985) (Brennan, J., dissenting) (noting that an "individual's right to ask for, and to receive, legal advice from the lawyer of his choice [is] fully protected by the First Amendment").

Furthermore, the Hobson's choice between less-favored counsel and untenable delay is faced only by potential claimants, not Stake. While claimants can't initiate arbitration against Stake if another claimant represented by the same counsel already has an arbitration proceeding pending, Stake is "apparently free to select the same law firm to represent [it] in all of [its] arbitrations." *MacClelland*, 609 F. Supp. 3d at 1042. Stake is thus "able to enjoy all of the advantages that come from being a 'repeat player,' while law firms representing [more than one] of [Stake's] customers may be forced to sideline" those extra clients. *Id.* at 1043; *see also Pandolfi*, 2024 WL 4051754, at *7 (finding such "built-in asymmetry" unconscionable).

This "repeat player" advantage is amplified by Stake's confidentiality provision, which requires that "neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder." (T&C § 26.6(b).) While ostensibly applying to both parties, this limitation exclusively burdens claimants: "[a]s a repeat player in arbitrations under its own contract, however, [defendants] will of course have access to information about past proceedings that the individual [plaintiffs] it arbitrates with will lack." *Bain v. Airoom*, 2022 IL App (1st) 211001, ¶ 39. This dynamic "burden[s] an individual customer's ability to vindicate [their] claims[s]" by "ensuring that none of [the defendant's] potential opponents will have access to precedent while, at the same time, [the defendant] accumulates a wealth of knowledge." *Id.* (quoting *Kinkel*, 223 Ill. 2d at 42); *see also Hwang v. Pathway LaGrange Prop. Owner, LLC*, 2024 IL App (1st) 240534, ¶ 21 (similar). This Court should reach the same conclusion.

> **b.** **Stake manufactures "cost-price disparity" via collective action waivers and liability limits.**

Once claimants finally make it to the front of the line to file a claim, Stake makes arbitration so cost-prohibitive that they may as well have stayed at home. In Illinois, arbitration agreements are unconscionable where the disparity between the cost to vindicate a claim and the

potential recovery is "so large and prohibitive so as to essentially preclude one from taking action." *Willis v. Captain D's, LLC*, 2015 IL App (5th) 140234-U, ¶ 32; *Kinkel*, 223 Ill. 2d at 29-30. This disparity exists here: Stake employs two interlocking arbitration requirements that saddle plaintiffs with costs while capping their damages, rendering relief economically unviable.

First, Stake claims to indemnify itself from attorneys' fees, (T&C § 24.1(a)), and punitive damages, (*id.* § 24.2(a)); and its Terms and Conditions purport to shield it from liability for any compensatory damages beyond "the amount you have paid us in the thirty (30) days immediately preceding the date on which you first assert any such claim pursuant to [the arbitration clause]," (*id.* § 24.2(b)).[8] Stake can unilaterally shorten this 30-day period by requiring users to first "exhaust[] [its] internal complaints process," (*id.* § 26.5(a)), a process that can take up to 10 days to even initiate. Given that Stake's liability cap applies from the date a consumer files for *arbitration*, not an internal complaint, (*id.* § 24.2(b)), Stake can minimize its liability by dragging out its internal review. The practical effect of these limitations is to reduce any claimant's possible recovery by a staggering percentage, given the amount of money that individuals like Mr. Urdan have lost to Stake over their years of gambling. And this is before being offset by the non-refundable filing fee and attorneys' fees, as discussed below.

Even setting aside the cumulative effect of these provisions, they are also individually unconscionable. Illinois finds contracts "void and unenforceable" when they limit recovery of punitive damages or attorney's fees, particularly when, as here, the case involves claims under the Consumer Fraud Act. *Bain*, 2022 IL App (1st) 211001, ¶ 33; *see also Turner*, 2023 IL App (1st) 221721, ¶ 34 (holding bar on award of punitive damages and attorneys' fees

---

[8] Stake's "limitation of liability" is detailed in § 24.2 and its arbitration provision in § 26. However, Stake incorporates its limitation of liability into its arbitration provision via cross-reference: its liability limitations apply to all claims "PURSUANT TO CLAUSE 26 BELOW." (T&C § 24.2(b).)

"unconscionable for contravening clear statutory language"). Illinois courts also find limits on compensatory damages unconscionable even where they apply to both parties. *See Hwang*, 2024 IL App (1st) 240534, ¶ 22; *see also Razor v. Hyundai Motor Am.*, 222 Ill. 2d 75, 105 (2006) (finding limitation of damages unconscionable in warranty agreement). Stake goes much further: it strips only consumers of their ability to recover compensatory damages while preserving its own right to full recovery. (T&C §§ 24.1, 24.2(b).)

Second, Stake strips plaintiffs of their ability to "PARTICIPATE IN ANY COLLECTIVE ACTION . . . INCLUDING AS A REPRESENTATIVE OR MEMBER OF A CLASS." (*Id.* § 26.8.) While this prohibition ostensibly applies to all parties, it is inherently one-sided, as "commercial entities . . . do not have occasion to sue their customers as a class." *Kinkel*, 223 Ill. 2d at 27. While in theory allowing plaintiffs to pursue individual claims, it forces them to shoulder the significant costs of arbitration. Here, that includes a non-refundable filing fee of $225 in addition to thousands in attorneys' fees.[9] *See id.* at 29 (recognizing that arbitration was possible "only with the aid of an attorney."); *Wigginton v. Dell, Inc.*, 382 Ill. App. 3d 1189, 1196–97 (2008) (similar for Consumer Fraud Act claims). In *Kinkel*, the combined costs of the $125 filing fee and attorneys' fees eclipsed the plaintiff's actual damages—an unconscionable outcome. 223 Ill. 2d at 30. Similarly here, the costs of arbitration and attorneys' fees threaten to eclipse the amount of Plaintiff's losses in the thirty days leading up to this case's filing.

Altogether, these provisions make consumer redress practically impossible. No attorney would undertake the "significant investment of time and resources" necessary to litigate complex statutory claims for only thirty days' worth of damages "even assuming that the arbitrator would

---

[9] American Arbitration Association, *Consumer Arbitration Rules and Mediation Procedures* (Jan. 15, 2024), https://www.adr.org/media/3uofn4lu/consumer_rules_and_mediation_procedures_feeschedule.pdf.

award [plaintiff] both punitive damages and attorney fees." *Keefe v. Allied Home Mortg. Corp.*, 393 Ill. App. 3d 226, 236 (2009). Individual plaintiffs therefore "may not be able to retain counsel" at all. *Id.* And even if they could retain counsel and prevail on the merits, "it is an absolute certainty that [they] would not be made whole": the $225 filing fee coupled with thousands in attorney's fees likely dwarf claimants' capped damages. *Kinkel*, 223 Ill. 2d at 30. The combined effect of these provisions is to make relief practically unattainable and to insulate Stake from an entire class of claims.

Finally, Plaintiff's arguments in this section are not precluded by *AT&T Mobility LLC*, 563 U.S. at 349. Contrary to Stake's contention, (Mot. at 4), the so-called "policy favoring arbitration" does not "favor arbitration over litigation"—it "is merely an acknowledgment of the FAA's commitment to . . . place [arbitration] agreements upon the same footing as other contracts." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022). Accordingly, arbitration provisions can be "invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *AT&T Mobility LLC*, 563 U.S. at 339. Here, several onerous provisions in Stake's terms interoperate to make the cost of vindicating a claim far greater than any potential recovery—a scenario recognized as unconscionable by Illinois courts. *Turner*, 2023 IL App (1st) 221721, ¶ 20. *AT&T Mobility LLC* has not foreclosed the argument that "an arbitration provision can be substantively unconscionable if it leaves a consumer with no practical remedy." *Valentine v. Wideopen W. Fin., LLC*, No. 09 C 07653, 2012 WL 1021809, at *5 (N.D. Ill. Mar. 26, 2012). To find otherwise would hold that *AT&T Mobility LLC* "eviscerated the savings clause." *Id.*

### 2. The arbitration agreement is procedurally unconscionable.

While substantive restrictions should alone invalidate the arbitration clause, *Kinkel*, 223 Ill. 2d at 21, significant procedural deficiencies offer further support for finding it unenforceable.

Procedural unconscionability exists where, "after considering all of the circumstances," terms are "so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware [he] was agreeing to [it]." *Turner*, 2023 IL App (1st) 221721, ¶ 20. Illinois courts are "more likely to find unconscionability" where "a consumer is involved," "there is a disparity in bargaining power," and the agreement is "on a pre-printed form." *Kinkel*, 223 Ill. 2d at 24. The arbitration agreement exhibits multiple signs of procedural unconscionability.

First, the Terms and Conditions are a textbook contact of adhesion. Stake, a sophisticated actor presumably assisted by lawyers, presented its Terms and Conditions to consumers on a "take-it-or-leave-it" basis. *Id.* Stake's users, on the other hand, are relatively unsophisticated laypeople—possibly with gambling addictions—who have no opportunity to negotiate any terms, let alone the arbitration provision. *See Kater v. Churchill Downs Inc.*, 423 F. Supp. 3d 1055, 1062 (W.D. Wash. 2019) (finding pop-up asking online casino users to agree to new terms coercive, noting that "[t]his ultimatum is made more coercive by the addictive nature of [the casino's] games and the fact that many players have already purchased chips that can only be accessed by agreeing to the terms").

Second, the arbitration provision is buried in dense text—it appears on page 21 of 25 in single-spaced text, embedded within a "maze of fine print." *Williams v. TCF Nat'l Bank*, No. 12 C 05115, 2013 WL 708123, at *6 (N.D. Ill. Feb. 26, 2013). Multiple critical provisions are scattered across different sections—arbitration procedures in clause 26 and damages limitations in clause 24, each with myriad sub-section. The result is a "confusing" and "opaque" contract, *Copper Bend Pharmacy, Inc. v. OptumRx*, 2023 IL App (5th) 220211-U, ¶ 22, that the average consumer will find "difficult to find, read, or understand." *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 777 (7th Cir. 2014).

17

Third, Stake conceals the true costs of arbitration. In *Kinkel*, the court found the arbitration provision procedurally unconscionable, in part, because it failed to "reveal the cost of arbitration to the claimant," later discovered to be a $125 non-refundable filing fee. 223 Ill. 2d at 29. Similarly, here, Stake does not inform plaintiffs that they will "have to pay anything at all towards the cost of arbitration." *Id.* at 27. A user reading the terms would have no knowledge of the $225 non-refundable filing fee, let alone the thousands in required attorneys' fees.

The existence of an opt-out does not mitigate these procedural defects. On August 23, 2024, two years after Mr. Urdan began using the platform, Stake attempted to shore up its arbitration clause by sneaking in an opt-out provision. (Dkt. 13-4 § 26.9.) Stake believes that this addition cures procedural unconscionability. (Mot. at 7.) It does not. For an opt-out to mean anything, consumers must have a real chance to use it—courts must consider the "important question of whether the circumstances brought to the plaintiff's attention . . . that she had the right to opt out of the arbitration provision . . . if she took certain steps." *Zuniga v. Major League Baseball*, 2021 IL App (1st) 201264, ¶ 36; *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2024 IL App (1st) 230361-U, ¶ 51, *appeal denied*, 238 N.E.3d 307 (Ill. 2024) (reversing grant of motion to compel on unconscionability grounds despite existence of opt-out); *see also Turner*, 2023 IL App (1st) 221721, ¶ 23 (fact that arbitration agreement was optional did not negate procedural unconscionability where plaintiff had no notice that it was optional). Yet Stake provided users no such opportunity. Stake knew how to notify users of updated terms and had done so in the past. (*See* Craven Decl. ¶ 17 (describing the May 17, 2023, update).) But for the opt-out, an update regarding "important legal rights," Stake provided no notice whatsoever—not via email, clickwrap pop-up, or otherwise. *Zuniga*, 2021 IL App (1st) 201264, ¶ 36. Unless users read the twenty-five pages of Terms and Conditions every single day, they would never know

they had an option.

What's worse, Stake gave users exactly thirty days to opt out from August 23, 2024, *not* from when they logged in and, purportedly, agreed to the new terms. (Dkt. 13-4 § 26.9.) If a user had an account but did not log in between August 23 and September 22, 2024 to read the new terms—of which they were not notified—they forfeited their right to litigation. Furthermore, Stake provides no evidence that Plaintiff logged in or otherwise had notice of the opt-out provision during this period. (*See, generally* Craven Decl.) This isn't a meaningful opportunity to opt out. It's window dressing meant to give the illusion of choice.

These factors, when combined with the substantive defects detailed above, provide overwhelming grounds to invalidate Stake's arbitration clause.[10]

### B. The Court—Not an Arbitrator—Decides Unconscionability Because the Delegation Clause itself is Unconscionable.

Defendants argue that the question of unconscionability should be decided by an arbitrator, not this Court, because of a delegation clause in the arbitration agreement. (Mot. at 8–9). But Illinois courts have held that the threshold issue of arbitrability is reserved for the courts, not arbitrators:

> When a party challenges the validity of an arbitration agreement, the court *must* consider the challenge before ordering compliance with the arbitration agreement even if a delegation clause purports to reserve that issue for the arbitrator. That rule

---

[10] Nor should this Court attempt to save the arbitration clause by severing unconscionable provisions. Severing the many unconscionable provisions from the arbitration agreement would be "tantamount to rewriting the Agreement," given these provisions do not operate independently. *Sanchez v. CleanNet USA, Inc.*, 78 F. Supp. 3d 747, 757 (N.D. Ill. 2015). Illinois courts have had occasion to consider and reject severability for arbitration agreements similar to but less onerous than the one proffered by Stake: "Where, as here, the drafting party has structured an arbitration agreement that is designed to make a claim expensive to bring, to bar any full recovery, and to ensure that the public does not learn of adverse findings against the company, the modifications necessary to render the agreement enforceable cannot be considered minor . . . and its unconscionable provisions cannot be severed." *Bain*, 2022 IL App (1st) 211001, ¶ 54. Furthermore, courts "should be cautioned against [severing these kinds of provisions], as it discourages the narrow and precise draftsmanship which should be reflected in written agreements." *Hwang*, 2024 IL App (1st) 240534, ¶ 27 (cleaned up).

applies to unconscionability as well because if a court finds that an arbitration agreement as a whole is unconscionable, then it cannot enforce a delegation within that arbitration agreement.

*Geller v. Uber Techs., Inc.*, 2025 IL App (1st) 241458-U, ¶ 20 (2025) (quotations omitted).

Regardless, even if the delegation clause were considered, the delegation clause itself is substantively and procedurally unconscionable (and therefore unenforceable). *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 74 (2010). In challenging the delegation clause, plaintiffs "may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions," including unconscionability. *Fahy*, 722 F. Supp. 3d at 797 (quotation omitted). Here, the delegation clause suffers from exactly the same defects as the arbitration clause. Specifically, adjudication by an arbitrator of the issue of arbitrability would be unduly delayed as a result of the bar on collective arbitration. *Pandolfi*, 2024 WL 4051754, at *6. In practice, this means that only one user could arbitrate the issue of arbitrability at a time, the result being that users would have to wait centuries to merely resolve whether their claims are arbitrable in the first place. The Terms and Conditions' other onerous provisions—the bar on class arbitration, the indemnification provision, and strict confidentiality clause—also operate to render obtaining relief on the unconscionability question realistically unattainable. Since the delegation provision is, itself, unconscionable, the Court should decide the issue of unconscionability.

## CONCLUSION

Because Plaintiff never agreed to arbitrate and because the arbitration clause in Stake's Terms and Conditions is invalid and unenforceable, Stake's motion should be denied.

Respectfully Submitted,

**BRAYDEN URDAN,** individually and on behalf of all others similarly situated,

Dated: August 7, 2025          By: /s/ Hannah Hilligoss

One of Plaintiff's Attorneys

J. Eli Wade-Scott
ewadescott@edelson.com
Michael Ovca
movca@edelson.com
Hannah Hilligoss
hhilligoss@edelson.com
Ari J. Scharg
ascharg@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel.: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff and the putative class*