1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRAYDEN URDAN, individually and on          )  No. 25 C 3736
behalf of all others similarly             )
situated,                                   )
                                            )
                    Plaintiff,              )  Chicago, Illinois
                                            )
            vs.                             )
                                            )
SWEEPSTEAKS LIMITED d/b/a                   )
STAKE.US,                                   )
                                            )  January 29, 2026
                    Defendant.              )  11:33 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GABRIEL A. FUENTES, MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:     EDELSON PC
                       BY:  MS. HANNAH HILLIGOSS
                            MR. MICHAEL W. OVCA
                       350 North LaSalle Street, 14th Floor,
                       Chicago, Illinois  60654

For the Defendant:     IFRAH LAW
                       BY:  MR. A. JEFF IFRAH
                            MR. ROBERT WARD
                       1717 Pennsylvania Avenue, NW, Suite 650,
                       Washington, DC  20006

PATRICK J. MULLEN
Retired Official Court Reporter
219 South Dearborn Street
Chicago, Illinois  60604
(708) 935-1931

*   *   *   *   *

TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Telephonic proceedings on the record.)

THE CLERK:  25 Civil 3736, Urdan versus Sweepsteaks Limited.

THE COURT:  Okay.  I appreciate everybody's patience. I hope you learned something.  Let's have our counsel make their appearances, Urdan first.

MS. HILLIGOSS:  Good morning, Your Honor.  This is Hannah Hilligoss for the plaintiff.

THE COURT:  Thank you.  Your volume is a little low, so maybe we'll ask you, Ms. Hilligoss, to see if you can amplify a little bit when you speak.  Okay?

MS. HILLIGOSS:  Yes, Your Honor.

THE COURT:  Okay.  That's better, actually.  Welcome. Anybody else from plaintiff's side, attorney Hilligoss?

MS. HILLIGOSS:  Yes.

MR. OVCA:  Good morning, Your Honor.  Michael Ovca for plaintiff.

THE COURT:  Okay.  Anybody else besides the two of you?

MS. HILLIGOSS:  No, that's all, Your Honor.

THE COURT:  Okay.  Who do we have for defense?

MR. WARD:  Good morning, Your Honor.  This is Robert Ward, W-a-r-d, for Sweepsteaks Limited.

THE COURT:  All right.  Anyone with you?

MR. WARD: No, just me, Your Honor.

MR. IFRAH: Good morning, Your Honor. This is Jeff Ifrah.

MR. WARD: Oh, Jeff, that's right. Never mind.

THE COURT: Okay. Go ahead, Mr. Ifrah. I'm sorry.

MR. IFRAH: Oh, yes, I'm here, too, Jeff Ifrah. Thank you, Your Honor.

THE COURT: Okay. You're welcome.

Then just very quickly, apologies to you, Mr. Ifrah and Mr. Ward, for my misreading of your initial motion. You did have a certification in there. So I appreciate you refiling with the proper spacing.

So let's get right to it. This is really -- the way I read it, I read this as an Apex motion, and the motion is filed, really, by Sweepsteaks. So maybe we will let Mr. Ifrah or Mr. Ward go first and tell us, you know, why we should bar the depositions of Mr. Craven and Mr. Galavalli, or is it -- is it -- I should say deponent Galavalli without knowing more.

The question I guess that I really have initially for Sweepsteaks that I've been mulling over, the comments that were related in the response about Judge Alonso apparently being very open to one or more of these depositions and the fact that you submitted document 13-1 from Mr. Craven stating that he made that declaration on personal knowledge and that that declaration addressed a number of issues about the platform,

about the arbitration agreement, about how it was ascribed to or agreed, for me kind of put you a little bit behind the 8-ball in trying to bar one or both of those depositions. So I'm just being frank with you. I thought that might be something you could address upfront, because I did read the papers.

MR. WARD: Thank you. Thank you, Your Honor. I'm happy to address that.

With respect to Mr. Craven, I think it's true, of course, that Judge Alonso's decision left open the possibility of depositions with --

THE COURT: Interrupting you for a second, your audibility and also your volume is kind of low. If you could amplify for us, and then state your name so that the recording that we're making, if it ever had to be transcribed, the court reporter would know who is speaking.

MR. WARD: Thank you, Your Honor. Just one moment. I'm going to --

THE COURT: Yes.

MR. WARD: -- change my volume.

THE COURT: Or just amplify. Pretend like it's eighth grade drama class.

MR. WARD: Okay. Hopefully, hopefully this will be a bit better. This is Robert Ward for Sweepsteaks Limited. It's, of course, true that Judge Alonso left open the

possibility of depositions with respect to the registration process and the later acceptance of the updated terms. That was, of course, before Sweepsteaks Limited had produced the documents and interrogatory responses that answer all of the questions that need to be answered to determine whether or not plaintiff accepted the terms in the arbitration agreement.

Sweepsteaks has provided the source code for every version of the account creation screen and the acceptance window screenshots and screen recordings that reflect the best approximation of what that source code would have produced given the technical limitations that plaintiff has referenced and that we explained to plaintiff since the beginning of this case, and plaintiff can now test on his own, given his access to that source code, so he is perfectly able to see those approximations that we've provided along with what the source code would have produced at the time.

The other issue is when the mandatory acceptance window appeared, what it required plaintiff to do and, again, we've provided that response in an interrogatory response. So Mr. Craven certainly has some knowledge of all of these facts. He's reviewed that source code. He reviewed the process by which that acceptance window appeared, but all of his knowledge comes from his review of the same documents that have been provided already to plaintiff. So there's nothing unique in his knowledge and certainly nothing unique in his knowledge,

whether coming from the documents or other employees at Sweepsteaks Limited who were actually involved in either the development or coding of the these registration processes or the acceptance window.

So putting that in terms of the Apex, you know, maybe not doctrine but, you know, theory, I guess in terms of the unique personal knowledge, that's sort of the number one factor that the cases talk about. It's unique personal knowledge, and he doesn't have unique personal knowledge. Everything that he would talk about in his deposition would be everything that's been covered in the document production and the written interrogatories.

Again, similarly, this isn't a case where he was substantially involved in creating those particular pieces of the website or even involved in sort of the day-to-day oversight of the engineering team that was responsible for those.

So, you know, in particular, we think that those two factors -- or that factor along with the availability of less intrusive means to obtain this information, whether through, you know, additional written discovery, perhaps a written deposition if the Court were to think a deposition in some form were required, would allow plaintiff to get the same information that they need or that they assert they need while not subjecting Mr. Craven to, you know, hours of testimony

going over what Sweepsteaks Limited thinks would amount to testing his memory more than getting useful information for this particular issue.

THE COURT: Okay. Another question for you, Mr. Ward. In the Craven declaration that you filed just recently which is document 44-6 on the docket, one of the things that Mr. Craven said was -- and I'm at paragraph 9:

"Sweepsteaks Limited software engineering team is and has been responsible for the development, implementation, and decision-making relating to the signup page and mandatory acceptance window."

I kind of inferred that the other deponent -- hold on a second.

(Pause.)

THE COURT: That proposed deponent Galavalli, given his engineering-related title, was maybe a person, a high-ranking person within the software engineering team or somebody with knowledge of how that team did those things on that subject. Am I right on that? And if I am, does it mean that when Craven says "don't ask me, it's the software engineering team that knows about this stuff," it's almost an invitation to say, well, then, let's depose Galavalli? What do you say that?

MR. WARD: Yes, Your Honor. So to make it clear, Mr. Galavalli's title is the engineering manager and, yes, he's

a member of the software engineering team and has high-level responsibilities with respect to that team.

You know, I think the point that Mr. Craven is saying there is that any knowledge he has is certainly not unique to him and, of course, you know, that suggests that other people may have that knowledge that may be, you know, subject to discovery.

But again, given what's been produced in the written discovery and the interrogatory responses and the comprehensive answers to the relatively narrow issues in dispute regarding the arbitration agreement, we think that, you know, the sort of normal Rule 26 factors would apply to Mr. Galavalli's deposition and warrant a protective order as well based on the fact that, again, any other information could be obtained through less burdensome, less costly means.

Some of those would be similar to what I discussed in the context of Mr. Craven's deposition, additional written discovery and perhaps a written deposition if some sort of testimony were necessary. That's another alternative that would be less burdensome and less intrusive and less costly for the parties.

I did want to note one other thing on a related topic. There is a reference to some of the informal questions that plaintiff has asked. We've been conferring with our client on responding to those and, you know, are not -- you know, this

isn't something we're trying to delay.  We are, of course, going to respond to those questions, and we just need to finalize some of the details before we do.

I did want to mention that because that is something that plaintiff raised in their opposition.  I just wanted to clarify for the Court that we do intend to respond, but given the time difference and the recent holidays, there has been some delay in coordinating that.

THE COURT:  Okay.  I appreciate that.  One thing we're trying to do is we try to get motions decided with relative alacrity.  I'm not sure if you all were on the line for our earlier two status conferences where I explained the procedures, but that is one of the things I'm trying to do, get things done with relative alacrity.

It does still give -- when we do a hearing, it would give you, for example, Mr. Ward, an opportunity to say something to me that you want to say in reply to the last filing which was made, I think, yesterday.  So anyway, the briefing, by the way, I thought, by everyone was very helpful.

Before I ask plaintiff's counsel a couple of questions, I'll just kind of tell everybody, having trodden the Apex deposition ground before, there's authority that I like, authority that I will tend to follow in this district, and one of those cases is City of Rockford versus Mallinckrodt ARD.  That's on Westlaw, 2020 Westlaw 1675593.

It does note that the depositions of higher-level executives may be protected or may be barred when any of four circumstances exist. One of them is, as is contended here, that the person has no unique personal knowledge of the matter in dispute. Maybe the information can be garnered from other witnesses or other discovery methods -- that's also something that Sweepsteaks contends here -- and the sitting for the deposition would impose a hardship in light of the officer's duties. I didn't feel like there was as good a case made for that in this case. It's not as though we're trying to depose -- I don't know -- Jamie Dimon of Chase, but that is a test that is kind of well worn and it's one that I follow.

But at the same time, even in the Mallinckrodt case and in other cases, courts have said that that burden really is a burden on the party seeking to bar the deposition, that it involves making a particular and specific demonstration of fact, and that it has to be a strong showing before a court should bar a deposition because it's a little bit of -- a semi-extraordinary bit of relief to do that.

So that's sort of the backdrop for how I would look at this. So you don't have to kind of go through the caselaw for me again because I think I get it. But my question is for plaintiff's counsel, and is it going to be counsel Hilligoss or counsel Ovca who's going to argue?

MS. HILLIGOSS: This is Hannah Hilligoss. Your Honor,

11

I will answer the question.

THE COURT: Okay. So my question for you is this. You know, they've made a case or an argument as to both of these persons that: Hey, we're giving you plenty of documents that answer these questions. It's kind of a discrete question, contract formation. You know, it's not the same heavily fact-laden question that you might find in other contexts, and these two persons are not the only persons with the information. They don't really have unique personal knowledge of it.

That's kind of the core I think of their argument under the Mallinckrodt factors, so, you know, what's your argument to them? Why should you still be allowed to get the depositions, even though defendant says that these two don't have you unique personal knowledge and discovery is available from other sources, including documents?

MS. HILLIGOSS: Of course, Your Honor. I think as an initial matter, I'll focus on Mr. Craven because it wasn't clear to us that they were actually arguing the Apex Doctrine applies to Mr. Galavalli, but I can also address him as well.

THE COURT: Okay.

MS. HILLIGOSS: As for Mr. Craven, the primary reason -- and we went over this sort of in the brief -- that we believe his deposition is necessary in addition to the documents we've --

THE COURT: Let me stop you. Let me stop you for a second. This is a feature of appearing by telephone, and I'm permissive about it. The phone line is garbling you a little bit in part because you're going really fast. Do me a favor.

MS. HILLIGOSS: Oh, sorry.

THE COURT: Yes, it's okay. See if you can slow down and, again, kind of articulate clearly and a little more slowly, because I'm kind of hearing you but we want the record to be something that a court reporter, if someday asked to, you know, transcribe this, gets down everything that you say. So kind of begin again at the beginning for me, if you would. Why should you get to depose these folks in light of what I've said?

MS. HILLIGOSS: Yes, Your Honor. Thank you. I took you off speaker as well. I hope that helps.

THE COURT: It's better. Thank you.

MR. WARD: Great. Okay. So just as an initial matter, it wasn't clear to us from the briefing that Stake contends that Mr. Galavalli is also subject to the Apex Doctrine. We don't think he is, which I can get into, but I'll focus on Mr. Craven to start.

So the primary reason why we think Mr. Craven's deposition is necessary in addition to the documents that were produced is because the production that Stake produced in December contradicts the sworn statements that Mr. Craven made

in his declarations, two declarations that he filed in support of Stake's motion to compel. So this raises serious questions about his credibility, and depositions are really the only way to get at that issue because, you know --

THE COURT: How does it contradict it?

MS. HILLIGOSS: So to give a specific example, Mr. Craven -- so there are two web pages at issue for contact coordination here because they contend that Mr. Urdan agreed to arbitrate by signing up for the Stake.US web page, because there was, they contend, an arbitration agreement in the terms and conditions that he agreed to when he signed up and then also a year later when he was shown a pop-up window.

So for arbitration, what we need to find to answer this question is to see if those screens that plaintiff was allegedly shown provide reasonably conspicuous notice of the terms and conditions such that signing up or, you know, going through the pop-up window constitute assent.

THE COURT: Okay. Tell me a little bit about -- I'm trying to follow, but help me a little bit and just take a step back. I'm looking at the July 2025 declaration which is at docket 13-1 that Craven made. Point me to a paragraph in there that's contradicted by the December 2025 document production and tell me how it's contradicted. Could you do that for me?

MS. HILLIGOSS: Of course, Your Honor. So in paragraph 9 -- or it's 8 and 9, I guess. So in 8 and 9,

Mr. Craven says that plaintiff signed up for the platform in August of 2022, and then it goes on to say that new users -- that the platform requires new users to affirmatively confirm that they agreed and accepted the platform's terms and conditions by checking a box that appeared next to the following statement:

"By clicking the checkbox, you are indicating that you have read and acknowledge terms and conditions."

So then in our response to the motion for a protective order, we submitted as an exhibit one of the documents that Stake produced. This is, I believe -- well, let me pull it up -- Exhibit 2. So this is document 48-2.

THE COURT: 48-2. Ms. Nunez, can you print out 48-2 for me so that I can follow along?

Go ahead, Ms. Hilligoss.

MS. HILLIGOSS: Yeah. So this is a document that we think defendants are contending represents what plaintiff saw when he signed up in 2022. This was actually one of the informal questions that we asked Stake, and they haven't responded yet.

So if you have it up, you'll note that in the signup page there's no checkbox and that the text that appears is different from that described by Mr. Craven. There are a couple of other contradictions as well, but those are the primary ones. They're important to the issue of formation

because whether or not there's a checkbox that someone has to click in order to agree to the terms and conditions is something the courts take very seriously in determining whether formation happened.

THE COURT: Okay. Any other contradiction you want to point me to? What you've done is very helpful, but is there anything else that you want me to know about?

MS. HILLIGOSS: Yeah. I mean, the main other one is that the terms and conditions here in 48-2 where it says "terms and conditions," it's not in the contracting color which Mr. Craven says that it is in that same paragraph. It's in paragraph 9, and that's another thing that courts look at when determining formation.

THE COURT: Okay. Let's see. Yes, the Craven declaration says:

"DNCs were hyperlinked in text that appeared in a different color than the rest of the statement, and that is something that either through review of documents or his personal knowledge, according to paragraph 2 of that declaration, he was aware of at the time of the declaration."

So you answered that question. What else did you want to tell me about the issue of unique personal knowledge, let's say, at least as to Craven, and then as to Galavalli, you know, whether that's somehow a disproportionate deposition because the information is going to be in possession of others,

including, for example, Craven?

MS. HILLIGOSS: Yes, Your Honor. So we really -- I mean, part of why we think these depositions are so reasonable is we are trying to keep them fairly limited in scope. We take seriously the -- you know, Mr. Craven submitted a third declaration saying that he has no additional personal knowledge other than what's in his declarations. We think that's a little bit dubious since he did review the source code, and we want to ask him, you know, what source code he reviewed in making his declarations, how he came to the conclusions that he included in his declarations, and whether that source code was produced to us.

But then other than that, you know, if it is true that Mr. Craven doesn't have additional personal knowledge of the workings of these pages, we're not trying to, you know, waste his or the Court's time getting into all of that, and that's where we really think Mr. Galavalli comes in as Stake's engineering manager.

Stake itself identified Mr. Galavalli as one of only three people with knowledge of how these screens work. They did this in their responses to our interrogatories. So we think that Mr. Galavalli is the correct person to answer the remaining questions about the technical aspects of the production, you know.

Stake doesn't even really argue that he's subject to

the Apex Doctrine. So really their main argument with respect to Mr. Galavalli is that his testimony would be duplicative of the production that they already sent, and we think that's incorrect because -- for a few reasons.

One is that, you know, in the normal course of discovery, depositions are routinely allowed, even in addition to document production, because often production needs to be explained. Like the things that Stake has produced are not self-explanatory, especially given that they produced a bunch of source code which is very, you know, technically complex. We don't know what they're claiming the source code represents or what time periods, and it's impossible to tell that from the production.

So we need to ask deposition questions to understand what they actually produced, what they're claiming it represents, and whether they have any evidence to support that, because what the pages, the web pages look like at specific time periods is really the heart of the formation issue.

THE COURT: All right. Ms. Hilligoss, one last question for you. Those last issues you were just walking through on understanding the technical platform better, who's more likely to be better equipped to respond to those questions effectively, Galavalli or Craven?

MS. HILLIGOSS: I mean, that's a little bit hard for us to answer since --

THE COURT: Give it a try.

MS. HILLIGOSS: -- we don't know what their background is.

THE COURT: Give it a try. What do you think?

MS. HILLIGOSS: I would anticipate that Mr. Galavalli would be the right person to ask those specific questions.

THE COURT: Yes.

MS. HILLIGOSS: Although it is -- sorry.

THE COURT: It's okay. You answered.

MS. HILLIGOSS: I would just say we would --

THE COURT: You answered.

MS. HILLIGOSS: Okay.

THE COURT: That was kind of my reaction, too, and I want to thank you for your candor. You know, sometimes, sometimes counsel, when a court poses difficult questions to them, will almost kind of decline to answer. You didn't do that, though. You were really forthright, and I appreciate it. But then I kind of cut you off because you had more you wanted to add. Please go ahead.

MS. HILLIGOSS: Oh, thank you, Your Honor. The only thing I wanted to add was that since Mr. Craven did say he was new to source code, we would want to ask him questions about that.

THE COURT: Okay. Briefly in rebuttal or reply, Mr. Ward, go ahead.

MR. WARD: Thank you, Your Honor. I think given what's been discussed today, you know, Sweepsteaks Limited, I think we would be willing to go forward with a limited deposition of Mr. Galavalli. We did not -- as plaintiffs correctly noted, we didn't and don't contend that the Apex Doctrine applies to him. We relied on the proportionality analysis and the burden.

So what we're willing to do here, I think, would be perceived as a limited deposition of Mr. Galavalli. We would prefer a written deposition but, you know, we'd leave that up to the Court.

THE COURT: Well, I'll help you with that. I'll help you with that.

MR. WARD: And to approve any notice of --

THE COURT: I'll help you with that. I've never seen a Rule 31 deposition that was helpful. Maybe in cases where the person is in a foreign country, and we've done some of those, where doing it in person was impossible.

MR. WARD: Your Honor --

THE COURT: But I'm really disinclined to say that this can be done through a written deposition. I'm just telling you that.

MR. WARD: Thank you, Your Honor. Mr. Galavalli is in Australia. I will note that. But, you know, of course, if the Court directs us to proceed through a remote deposition, of

course, we'll arrange that with plaintiff's counsel.

But at the same time, because Mr. Galavalli is closer to these matters and Mr. Craven does not have the unique knowledge that we think -- and we think we've met our burden on that point under the Apex theory, plaintiffs at the very least should be precluded from noticing a deposition of Mr. Craven at this point. We can let the deposition of Mr. Galavalli go forward and then, if necessary, we can come back to discuss any open issues. But we would expect that a deposition of Mr. Galavalli would answer any questions that plaintiff may have about the production at this point.

THE COURT: Okay. So, first of all, again, I want to thank all counsel for doing a good job on this motion and being very, very candid and thorough today. It is the kind of motion that in the court's management of discovery the Seventh Circuit affords the magistrate judge considerable discretion in deciding these kinds of issues, Jones v. City of Elkhart, 737 F. 3d 1107, Seventh Circuit, 2013.

So I decide the case with that in mind and also with Rule 1 in mind, right? Rule 1 says that, you know, we should be promoting the just, speedy, and inexpensive determination of matters. So that's another sort of governing principle that as I look at this, I'm going to come with a ruling.

Let's see, the protective order, the movant is Sweepsteaks. So I'm going to deny the Sweepsteaks motion to

preclude the Craven deposition but without prejudice. Oh, wait. Let me think about that.

(Pause.)

THE COURT: No, I'm going to grant the portion of the motion that bars the Craven deposition, but my ruling would allow that issue to come up again after Galavalli is deposed. So I'm concerned about the alleged discrepancy between some of the documents and his prior declaration. I don't know that I see the source code issues as a reason to do that deposition. I'm not persuaded that he has unique personal knowledge on that.

I'm a little concerned about the need -- about depriving the plaintiff of the need to test some of the things that were said in the declaration of Craven, given what the plaintiff views as documents that contradict that. I'm not resolving whether they do or whether they don't, but I think the argument that they do contradict his declaration is colorable enough to raise a concern.

But again, I'm really not persuaded that his knowledge on that issue would be so unique that he ought to be subjected to a Rule 30(b)(6), and so we are treating him as an Apex witness.

Galavalli, on the other hand, I think candidly Sweepsteaks admits that they're not really arguing Apex as to him, and it's interesting that that declaration of Mr. Craven

in paragraph 9 pretty much suggests that these answers will very likely reside with the software engineering team, meaning Mr. Galavalli seems an appropriate person to ask.

I'm persuaded also by what Judge Alonso had indicated before, that there could well be a need to test some of these statements that appear in declarations, and I think that's important enough to make the Galavalli deposition proportional under a 26(b)(1) analysis, proportional and relevant as to these formation issues and how this technology works, how someone can go to a signup page and agree to terms that could include an arbitration agreement, and how well all of that is disclosed and how clear it is. Those all strike me as issues that Mr. Galavalli can address and are not really overcoming Apex as to his deposition.

So that's where I'm coming out. The motion is denied as to Galavalli and granted as to Craven, but I'm leaving the door open for Craven to get deposed if that really does become necessary. I'd rather not see a motion where it really isn't but is being filed only because I left the door open.

So, plaintiffs, you know, consider that carefully because this strikes me as a -- you're going to get a lot of information from Galavalli and, you know, it's a contract formation issue. Chasing every squirrel up every barn and undertaking the time and expense to do that is really not going to be something I'm in favor of. We're really just talking

about formation discovery, and I'm hypothesizing that the Galavalli deposition will be sufficient.

So based on all of that and consistent with Mallinckrodt and consistent with Rule 26(b)(1), Rule 1, and my discretion under Jones, that's our ruling. It's partially granted, partially denied, and the Galavalli deposition goes forward. You know, you're free to arrange that by video. If that is something that you will mutually agree upon how that will be done, that's perfectly fine with the Court and probably would save everybody a lot of time and money. Certainly we do settlement conferences here all the time by video with parties who are overseas.

So that was all I had and that's our ruling, but is there anything else from the movant, Sweepsteaks?

MR. WARD: No, Your Honor, nothing further from us.

THE COURT: All right. How about from plaintiff Urdan? Anything else from plaintiff?

MS. HILLIGOSS: No. Oh, actually yes, Your Honor. We had a -- I think we noted this in our last status report, but we currently have a close of discovery deadline set for February 16th. Given the depositions, we maybe want to maybe just revisit that deadline a little bit. We could maybe file a status report, or we can discuss it now.

THE COURT: Let's do this. Confer with Mr. Ward and Mr. Ifrah and see if you can reach agreement, because what I'd

like to do, rather than do it hastily, I'm inclined to grant your extension. I'd really like to keep it to the Galavalli deposition. I'd really like to keep extensions for the limited persons for which they're necessary. But if I were to do that today, I would deprive you of the chance to speak with defense counsel and think about if there's somehow more that you should be allowed to do because I wouldn't want to be surprised by that later. So do me a favor, confer.

It's already January 29, so get that on file by the end of next week, which is February 6. Any motion to extend discovery for any limited purpose is due by noon on February 6. Sound good, Ms. Hilligoss?

MS. HILLIGOSS: Yeah, that sounds good. I think -- I mean, I understand Your Honor's ruling and your position on Mr. Craven's deposition. Unfortunately, I do expect we're going to have to move to depose him because we won't be able to ask Mr. Galavalli about the specific representations made in Mr. Craven's declaration because those are, you know, within the exclusive knowledge of Mr. Craven and Stake has already said that Mr. Craven is going to be submitting another declaration in support of their forthcoming renewed motion to compel.

THE COURT: Yes. Well --

MS. HILLIGOSS: So I do, unfortunately, think that's going to be necessary, but we'll get that motion on file at the

end of the next week.

THE COURT: Well, I think I've already ruled on it, though, because I said that we're not chasing every squirrel up every barn. I'm not saying that what you're looking for from him is somehow going to be so irrelevant that you could never get it, but I'm saying that I'm not sufficiently persuaded that you overcome Apex with that.

So I think that's a big part of what we've talked about today. I'm only interested in him getting deposed if what you learn from Galavalli somehow reveals that there's something that maybe would be within his unique personal knowledge or that it would actually make sense to do that deposition.

But as you pointed out, discovery is set to close February 16th so, you know, it's time to wrap this up. We're talking about contract formation, and what you're looking for from him, I get that there might be very, very good reason to get all that. But you might -- you don't always get everything you absolutely want in discovery because I'm in my discretion to limit it, and that's what I've done in granting the motion as to Craven. I hope I was clear about it because maybe I was not as clear before. Is that helpful?

MS. HILLIGOSS: Yes, that's helpful. Thank you, Your Honor. I just wanted to make the point for the record.

THE COURT: I got you. I didn't want to waste

resources on a motion that I'm probably going to deny.  Anybody can file any motion they want, but I want it to be clear that I think I've already ruled on that.

All right.  Anything else, Ms. Hilligoss?

MS. HILLIGOSS:  No, that's all from us.  Thank you.

THE COURT:  Okay.  Thanks, everybody.  I appreciate your work today, and I appreciate that you keep taking care of yourselves and your families.  We will adjourn, and you will get an order.  I'm probably going to look for -- oh, I've got a February 6 date for your motion, so that will be the next date you have to do anything on.  If need be, we'll set another status report, but I think we're on track to keep things moving.  Okay?

MS. HILLIGOSS:  Thank you, Your Honor.

THE COURT:  Very good.  Very good.  Thank you.

MR. WARD:  Thank you, Your Honor.

(Proceedings concluded at 12:11 p.m.)


                    C E R T I F I C A T E

I certify that the foregoing is an accurate transcript produced from an audio recording of the proceedings in the above-entitled matter.

*/s/Patrick J. Mullen*                    *February 3, 2026*

Patrick J. Mullen
Retired Official Court Reporter