# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |
|---|---|
| BRAYDEN URDAN, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>SWEEPSTEAKS LIMITED d/b/a STAKE.US,<br><br>*Defendant*. | Case No. 1:25−cv−03736<br><br>Hon. Jorge L. Alonso<br><br>Mag. Gabriel A. Fuentes |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
RENEWED MOTION TO COMPEL ARBITRATION**

**TABLE OF CONTENTS**

INTRODUCTION...................................................................................................................1

BACKGROUND .................................................................................................................1

ARGUMENT.....................................................................................................................4

I.      STAKE FAILS TO MEET ITS BURDEN TO ESTABLISH AN AGREEMENT TO
ARBITRATE....................................................................................................... 4

     A.     Stake's Key Evidence Is Inadmissible................................................... 5

           1.     Stake's Evidence Does Not Meet Rule 901(a)'s Standards.................... 5

                  *i.*     *Stake fails to prove the content and context of any screenflows
purportedly at issue.* ........................................................ 6

                  *ii.*    *Independent evidence calls the re-creations' accuracy into
serious question*............................................................... 9

           2.     Stake's Re-creations Are Inadmissible Hearsay...................................11

     B.     The Re-creations Do Not Establish Assent to Arbitrate................................. 12

           1.     The August 2022 Registration Page Does Not Establish Assent. ........ 12

           2.     The May 2023 Mandatory Acceptance Window Does Not Establish
Assent. ............................................................................................. 15

II.     THE ARBITRATION CLAUSE AND DELEGATION CLAUSE ARE
UNCONSCIONABLE AND, THEREFORE, UNENFORCEABLE. ......................... 16

     A.     The Arbitration Clause Is Unconscionable...................................................... 16

           1.     The Arbitration Agreement Is Substantively Unconscionable............ 17

           2.     The Arbitration Agreement Is Procedurally Unconscionable............. 19

     B.     The Court—Not an Arbitrator—Decides Unconscionability Because the
Delegation Clause Itself is Unconscionable...................................................... 20

CONCLUSION ..............................................................................................................20

i

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011)........................................................................................................ 4

*Rent-A-Ctr., W., Inc. v. Jackson*,
  561 U.S. 63 (2010)........................................................................................................ 20

**United States Court of Appeal Cases**

*Bazemore v. Jefferson Cap. Sys., LLC*,
  827 F.3d 1325 (11th Cir. 2016) .................................................................................... 15

*Domer v. Menard, Inc.*,
  116 F.4th 686 (7th Cir. 2024) ................................................................... 4, 12, 13, 14

*Faulkenberg v. CB Tax Franchise Sys., LP*,
  637 F.3d 801 (7th Cir. 2011) ........................................................................................ 4

*Jackson v. Payday Fin., LLC*,
  764 F.3d 765 (7th Cir. 2014) ...................................................................................... 19

*Mason v. Midland Funding LLC*,
  815 F. App'x 320 (11th Cir. 2020) ....................................................................... 8, 15, 16

*Sgouros v. TransUnion Corp.*,
  817 F.3d 1029 (7th Cir. 2016) ................................................................................... 6, 14

*Shockley v. PrimeLending*,
  929 F.3d 1012 (8th Cir. 2019) .................................................................................... 13

*Specht v. Google Inc.*,
  747 F.3d 929 (7th Cir. 2014) ....................................................................................... 5, 8

*Tinder v. Pinkerton Sec.*,
  305 F.3d 728 (7th Cir. 2002) ....................................................................................... 4, 5

*United States v. Briscoe*,
  896 F.2d 1476 (7th Cir. 1990) .................................................................................... 11

*Wallrich v. Samsung Elecs. Am., Inc.*,
  106 F.4th 609 (7th Cir. 2024) ...................................................................................... 4

**United States District Court Cases**

*Anand v. Heath*,
No. 19-cv-00016, 2019 WL 2716213 (N.D. Ill. June 28, 2019) ...................................... 15, 16

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015) ................................................................................ 16

*Campos v. Tubi, Inc.*,
716 F. Supp. 3d 623 (N.D. Ill. 2024) ............................................................................... 16

*Fahy v. Minto Dev. Corp.*,
722 F. Supp. 3d 784 (N.D. Ill. 2024) .......................................................................... 17, 20

*Fitzpatrick v. Lens.com Inc.*,
No. 24 CV 2700, 2024 WL 4555337 (N.D. Ill. Oct. 23, 2024) .............................................. 14

*Hamera v. Best Buy Co.*,
790 F. Supp. 3d 664 (N.D. Ill. 2025) ........................................................ 5, 6, 9, 11, 13

*Johnson v. Hum. Power of N Co.*,
767 F. Supp. 3d 845 (N.D. Ill. 2025) ........................................................................... 14, 15

*Johnson v. Uber Techs., Inc.*,
No. 16 C 5468, 2017 WL 1155384 (N.D. Ill. Mar. 13, 2017) ......................................... 4, 6, 8

*Kater v. Churchill Downs Inc.*,
423 F. Supp. 3d 1055 (W.D. Wash. 2019) ....................................................................... 19

*M&G Health Assocs., Inc. v. Health Care Serv. Corp.*,
No. 08 CV 3944, 2009 WL 10740611 (N.D. Ill. Feb. 24, 2009) ........................................ 11

*MacClelland v. Cellco P'ship*,
609 F. Supp. 3d 1024 ........................................................................................................ 17

*Monotype Imaging, Inc. v. Bitstream Inc.*,
376 F. Supp. 2d 877 (N.D. Ill. 2005) ............................................................................... 6

*Monper v. Boeing Co.*,
No. C13-1569, 2016 WL 1703839 (W.D. Wash. Apr. 28, 2016) .................................... 11, 12

*Pandolfi v. AviaGames, Inc.*,
No. 23-cv-05971, 2024 WL 4051754 (N.D. Cal. Sept. 4, 2024) ........................................... 18

iii

*Randolph v. Dillard's, Inc.*,
No. 1:24-cv-10084, 2025 WL 975579 (N.D. Ill. Apr. 1, 2025) ............................................... 5

*Sanchez v. CleanNet USA, Inc.*,
78 F. Supp. 3d 747 (N.D. Ill. 2015) ................................................................................ 20

*Williams v. TCF Nat'l Bank*,
No. 12 C 05115, 2013 WL 708123 (N.D. Ill. Feb. 26, 2013) .................................................. 19

*Wilson v. Redbox Automated Retail, LLC*,
448 F. Supp. 3d 873 (N.D. Ill. 2020) ................................................................................ 5, 14

**State Court Cases**

*Bain v. Airoom, LLC*,
2022 IL App (1st) 211001 .................................................................................................. 18

*Copper Bend Pharmacy, Inc. v. OptumRx*,
2023 IL App (5th) 220211-U ........................................................................................... 19

*Geller v. Uber Techs., Inc.*,
2025 IL App (1st) 241458-U ............................................................................................ 20

*Hwang v. Pathway LaGrange Prop. Owner*,
2024 IL App (1st) 240534 ............................................................................................... 18, 20

*Keefe v. Allied Home Mortg. Corp.*,
393 Ill. App. 3d 226 (2009) ............................................................................................. 18, 19

*Kinkel v. Cingular Wireless LLC*,
223 Ill. 2d 1 (2006) ....................................................................................................... 17, 18, 19

*Razor v. Hyundai Motor Am.*,
222 Ill. 2d 75 (2006) ...................................................................................................... 18

*Turner v. Concord Nursing & Rehab. Ctr., LLC*,
221 N.E.3d 347 (Ill. 2023) .............................................................................................. 17

*Turner v. Concord Nursing & Rehab. Ctr., LLC*,
2023 IL App (1st) 221721 ................................................................................................ 17, 18, 19

*Willis v. Captain D's, LLC*,
2015 IL App (5th) 140234-U ........................................................................................... 18

**Federal Rules**

Fed. R. Evid. 803(6) .................................................................................................... 11

Fed. R. Evid. 801(c) .................................................................................................... 11

Fed. R. Evid. 901(a) ............................................................................................. 5, 8, 11

**Other Authorities**

*Acknowledge*, BLACK'S LAW DICTIONARY (12th ed. 2024) .......................................................... 13

*Assent*, BLACK'S LAW DICTIONARY (12th ed. 2024) .................................................................. 13

## INTRODUCTION

Defendant Sweepsteaks Limited's ("Stake") second attempt to compel arbitration abandons the rationale it asserted in its first attempt and drops its reliance on declarations that have proved to be untrue. The grounds underlying Stake's renewed motion fare no better. Stake did not maintain any of the workflows that reflect what a user would have seen when navigating the arbitration sign-ups that Stake invokes. Without any contemporaneous records, Stake relies on one supposed "reconstruction" after another of a consumer's experience using the Stake platform. These reconstructions are riddled with inaccuracies and fail to demonstrate the specific evidence the Court ordered discovery on when it denied Stake's first motion: "the actual appearance of the webpages at the relevant time." (Dkt. 31 at 2.) Most glaringly, a key sign-up workflow apparently shows the user experience of a different Stake website than the one at issue in this case, and Stake's witness was unable to confirm that it reflected what Stake users would have seen at the time. Stake has failed to carry its burden to show that Plaintiff agreed to arbitrate his claims. First, Stake's reconstructions are inadmissible, inaccurate depictions of what Stake users saw. Second, to the extent they are considered, they do not establish Plaintiff assented to arbitration. They do not provide reasonably conspicuous notice or show an unambiguous manifestation of agreement to arbitrate. Third, even assuming the existence of an agreement, it is unenforceable. The onerous terms would leave consumers waiting centuries to have their claims heard and impermissibly restrict the damages available to them to less than the cost of the arbitration itself. For these reasons, and as explained below, Stake's motion should be denied.

## BACKGROUND

Stake.us is an online casino where users buy and wager virtual coins redeemable for real money. (Complaint ("Compl.") ¶ 34.) Plaintiff Brayden Urdan ("Plaintiff") alleges that Stake's

1

website constitutes illegal gambling falsely marketed as free-to-play "sweepstakes." (*Id.* ¶¶ 1–4, 33–43.)

Stake's first motion to compel rested entirely on two declarations from Edward Craven, Stake's founder, who described the sign-up process he said users completed in August 2022 and a "mandatory acceptance window" (the "MAW") he said users encountered in May 2023. (Dkt. 13-1 ¶¶ 9, 17; dkt. 28-1 ¶¶ 5–8.) Stake did not include any screenshots of the sign-up page or MAW. Mr. Craven and Stake's counsel both represented that "technical limitations"— specifically, third-party software libraries that no longer supported the prior versions—made it impossible for Stake to do so. (Dkt. 28-1 ¶¶ 6–7; dkt. 25-1 at 7–8.) The Court allowed Plaintiff discovery into issues of contract formation.[1] (Dkt. 31.)

In response to arbitration-related discovery requests, Stake produced certain source code from its historical codebase, along with certain screenshots and recordings generated in November 2025—notwithstanding Stake's prior representations that this was technically impossible. (*Compare* Dkt. 28-1 ¶¶ 6–7; dkt. 25-1 at 7–8, *with* Ex. 1, Galavalli Dep. at 108:11– 109:2, 123:12–22, 137:9–16.) One piece of evidence was an account registration screenshot. According to Sarath Galavalli, this was created by running source code on a developer's machine disconnected from the systems that stored and delivered content to users. (Ex. 1, Galavalli Dep. at 124:12–23 (explaining that, when recreating the account registration screenshot, he "was not able to connect the back end" servers that supply the live website content, and instead "re-created the front end on [his] local" machine).) Mr. Galavalli testified this "re-created the [user interface]

---

[1]     Despite the Court's order permitting Plaintiff to take Mr. Craven's deposition into issues of contract formation, Stake obtained a protective order barring that examination. (Dkt. 49.) Mr. Galavalli then refused to answer questions about Mr. Craven's declarations at his own deposition, repeatedly stating he was "not here to talk on behalf of what Craven said." (Ex. 1, Deposition of Sarath Galavalli ("Galavalli Dep.") at 118:24–119:7; *see, e.g., id.* at 119:21–120:7, 148:12–22, 150:6–21.)

2

and [user] experience," but not "the data," including the Terms and Conditions (the "Terms"), or "what exactly would the user have looked at" in August 2022. (*Id.* at 37:12–19.) Stake also produced a screenflow showing the MAW—a pop-up that Stake claims required existing users to scroll through and accept updated Terms before accessing the platform. This was made in a test environment, and Mr. Galavalli testified he could not confirm whether what appeared on screen reflected the platform as it existed on May 17, 2023, or if it was from the testing environment in November 2025. (Ex. 1, Galavalli Dep. at 144:23–145:2.)

Crucially, these re-creations appear to depict the wrong platform. Each contains hallmarks of Stake.com, the international gambling website Stake's parent company operates, rather than Stake.us, the website at issue in this case. A screen recording of the full registration webpage shows an "18+" age symbol, even though Stake.us requires users to be over 21. (Ex. 2, STAKE 000046; dkt. 57-3 at 6.) The MAW recording shows a Bitcoin wallet balance at the top of the screen, (dkt. 57-10; *see* dkt. 57-9), but Stake.us only offers "Gold Coins" and "Stake Cash," not cryptocurrency. (Dkt. 57-3 at 10–12; *id.* at 13.) The Terms displayed refer to Stake.com, not Stake.us. (Dkt. 57-10.) Stake's own counsel acknowledged as much: "the text in the scroll window in the [MAW recording] is not the same text the Stake.us platform would have displayed on May 17, 2023." (Ex. 3, Feb. 2, 2026 email from Robert Ward.)

The production contradicted the Craven declarations on every material point. Mr. Craven swore that users were required to check a box next to specific text and that the Terms hyperlink "appeared in a different color than the rest of the statement." (Dkt. 13-1 ¶ 9.) The re-creation shows no checkbox, no contrasting color, and different text. (Dkt. 57-7.) Mr. Craven subsequently admitted that he "was not involved in the development, implementation, or decisionmaking relating to the Platform's Sign-up Page" or the MAW. (Jan. 2026 Declaration of

3

Edward Craven ("Jan. 2026 Craven Decl."), dkt. 44-6 ¶¶ 7–8.) Stake's counsel represented that Mr. Craven would amend his declaration to reflect the production. (Dkt. 44-5 at Ex. D-1.) He did not. Stake simply dropped him as a witness and refused to produce him to answer questions about his claims.

## ARGUMENT

Stake's renewed motion to compel arbitration should be denied. First, the exhibits on which Stake's case depends are unreliable and inadmissible, as they do not accurately reflect what Plaintiff would have seen when he used Stake's website. Second, even if they are considered, the materials do not establish that Plaintiff agreed to arbitrate. Third, the arbitration provision is unenforceable on unconscionability grounds.

## I.   STAKE FAILS TO MEET ITS BURDEN TO ESTABLISH AN AGREEMENT TO ARBITRATE.

"[A]rbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). "Whether an agreement to arbitrate has been formed is governed by state-law principles of contract formation."[2] *Domer v. Menard, Inc.*, 116 F.4th 686, 694 (7th Cir. 2024). The movant must show three elements: "(1) an enforceable written agreement to arbitrate; (2) a dispute within the scope of the arbitration agreement; and (3) a refusal to arbitrate." *Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 617–18 (7th Cir. 2024). "Motions to compel arbitration are analyzed under a quasi-summary judgment standard." *Johnson v. Uber Techs., Inc.*, No. 16 C 5468, 2017 WL 1155384, at *2 (N.D. Ill. Mar. 13, 2017) (citing *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002)). The party seeking to compel arbitration bears the initial burden. *Wallrich*, 106 F.4th at 618. If it does, the party resisting arbitration must identify a triable issue

---

[2]     Stake's Terms contain a Delaware choice-of-law clause, but Stake applies Illinois law for purposes of this motion, and Plaintiff does not dispute that Illinois law governs. *See Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809 (7th Cir. 2011).

4

of fact. *Tinder*, 305 F.3d at 735; *see Randolph v. Dillard's, Inc.*, No. 1:24-cv-10084, 2025 WL 975579, at *6 (N.D. Ill. Apr. 1, 2025). "If the party opposing arbitration demonstrates that there is a genuine issue of material fact concerning the existence of an agreement to arbitrate, the issue shall proceed to trial." *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 880 (N.D. Ill. 2020). The Court "must accept the non-movant's evidence as true and draw all reasonable inferences in [their] favor." *Id*. Stake's motion stumbles at the outset: it has failed to provide sufficient evidence that an agreement to arbitrate exists.

### A. Stake's Key Evidence Is Inadmissible.

Stake must rely on admissible evidence to carry its burden of showing that an agreement to arbitrate was formed. *See Hamera v. Best Buy Co.*, 790 F. Supp. 3d 664, 667 (N.D. Ill. 2025). The two re-created screenshots and the screen recording at the center of Stake's renewed motion cannot be authenticated under Federal Rule of Evidence 901(a), and they are hearsay statements that do not fall into any exception. Thus, they are inadmissible and cannot be relied on.

### 1. Stake's Evidence Does Not Meet Rule 901(a)'s Standards.

Federal Rule of Evidence 901(a) requires the proponent of evidence to demonstrate proof "sufficient to support a finding that the item is what the proponent claims it is." Courts in this District apply that requirement to website screenshots through a two-part inquiry: (1) whether the proponent has produced "a witness with personal knowledge who represents that the screenshot shows what would have appeared on the user's screen at the relevant time," and (2) whether independent evidence "call[s] into question . . . the accuracy of the screenshot." *Hamera*, 790 F. Supp. 3d at 669–70; *see Specht v. Google Inc.*, 747 F.3d 929, 933 (7th Cir. 2014) (requiring "authentication by someone with personal knowledge of [the] reliability of the archive service from which the screenshots were retrieved"). Establishing these factors is crucial here because determining whether a user agreed to an online contract requires a "fact-intensive inquiry" into

what the user actually encountered. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034–35 (7th Cir. 2016). Courts "cannot presume that a person who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)." *Id.* at 1035. Authenticating a re-created depiction of that encounter therefore requires the proponent to establish both what users would have seen on the screen and how the platform actually operated when users interacted with it. *See Hamera*, 790 F. Supp. 3d at 669 (finding "adequate authentication" where witness with personal knowledge that "the screenshot shows what would have appeared on the user's screen at the relevant time"); *Johnson*, 2017 WL 1155384, at *2 (evidence showing only "what a person sees" in the registration process was insufficient where it did not establish "the process as it existed" on the date of registration); *Monotype Imaging, Inc. v. Bitstream Inc.*, 376 F. Supp. 2d 877, 885 n.6 (N.D. Ill. 2005) (recognizing authenticated copies of "what was present on those websites" still "lack[ed] authentication" to show "the alleged steps taken" or "the functioning" of the underlying software). Stake fails to do both here.

### i. Stake fails to prove the content and context of any screenflows purportedly at issue.

First, Stake's evidence cannot establish what Plaintiff actually saw. Whatever Mr. Galavalli's declaration may claim now about the registration screenshots (dkt. 57-6 ¶¶ 27, 36), he took a contradictory position at his deposition—one that underscores that neither re-creation shows what Plaintiff actually saw or experienced. According to Mr. Galavalli, the registration screenshot captures only appearance—the visual layout—and omits the content and context the live platform would have delivered to users. (Ex. 1, Galavalli Dep. at 37:10–19.) That's because Mr. Galavalli generated it by running historical code on his local machine, disconnected from any backend, database, or content management system. (*Id.* at 124:12–23.) Without those

systems, it was impossible to recreate what the live platform would have produced in response to a user's actions—what content the Terms hyperlink would have loaded, how the form would have responded when submitted, what data would have been transmitted, etc. Mr. Galavalli admitted as much: the screenshot captured "the [user interface] and [user] experience" but not "the data," and "only using what [Stake] provided," he "could not produce the terms and conditions text if someone didn't independently know what that text was." (*Id.* at 37:10–19, 39:21–40:1.) He was not even certain whether the content management system hosting the terms was in use at the relevant time. (*Id.* at 64:3–18.)

Turning to the MAW, the recording captures only functionality—the click flow—without displaying any content that users actually saw on May 17, 2023, the date Stake contends Plaintiff saw some version of the MAW. (*Id.* at 145:17–146:20.) Mr. Galavalli could not run May 2023 code because the third-party libraries it relied on were no longer available. (*Id.* at 145:6–15.) Instead, he generated the screenshots and recording in Stake's testing environment in November 2025. (*Id.* at 137:9–16, 138:21–139:12.) The result, in Mr. Galavalli's own words, was "the opposite" problem of the registration screenshot: "the functionality is exactly the same; but the UI/UX, I wouldn't be able to say whether it's exact on that date or not." (*Id.* at 145:17–146:20; 146:4–6 (conceding he "would not be able to say" whether the recording showed "the exact thing that the user would have seen" on May 17, 2023).) Mr. Galavalli underscored that he didn't know whether the recording reflected the live platform on May 17, 2023 or the staging environment in November 2025: "I'm not sure whether I re-created it to be, like, the thing that happens exactly on the production on that date, or is it on the day when it happened on the staging environment." (*Id.* at 144:23–145:2.) Mr. Galavalli even disclaimed that he had knowledge to answer that question, stating "I wouldn't be able to give . . . the specific details

because I'm not a dev ops engineer." (*Id.* at 52:5–10.)

In short, Mr. Galavalli has admitted that neither re-creation includes the complete picture of what users would have seen on their screens and how they would have interacted with what was displayed. A witness who cannot say what users saw, what content the platform delivered, or whether a re-creation matches the live platform on the relevant date does not provide the personal knowledge Rule 901(a) requires. Courts confronting similar evidentiary gaps have refused to compel arbitration. *See Specht*, 747 F.3d at 933; *Johnson*, 2017 WL 1155384, at *2 (denying motion to compel where defendant's declarant "neither describe[d] the process as it existed on [the date plaintiff registered] . . . nor represent[ed] that the process is the same now as it was then"); *Mason v. Midland Funding LLC*, 815 F. App'x 320, 324–25 (11th Cir. 2020) (defendants failed to show "what terms [plaintiff] actually saw . . . when he viewed the website" where their witness produced only an application "*in a substantially similar form*").

*Scanlon v. DraftKings Inc.*, No. 2384CV02365, slip op. at 9 (Mass. Super. Ct. Feb. 17, 2026) (attached as Ex. 4) is instructive. *Scanlon* involved an online gambling platform defendant relying on after-the-fact re-creations of customer sign-up flows in an attempt to compel arbitration. *Id.* Just as in this case, DraftKings ran historical data through current code in test environments to generate screenshots of what customers "would have" purportedly seen. *Id.* The court rejected these re-creations as inadmissible, finding they were not contemporaneous records, and the witness offering them could not connect the test environment to what customers actually saw. (*Id.* at 9–10.) "DraftKings rests on the assumption that by entering the [contract] terms and conditions into a test account, its platform will generate a facsimile of what the customers saw. But . . . DraftKings has not authenticated 'the generative process that created the records.'" (*Id.* at 14.) The same is true of Stake's re-creations, where any attempt at authentication fails for the

same reasons.

### ii. Independent evidence calls the re-creations' accuracy into serious question.

The re-creations fail authentication for a second, independent reason: the record contains substantial evidence undermining the claim that they depict what users saw on Stake.us. *Hamera*, 790 F. Supp. 3d at 669–70. That evidence comes in two forms: the contents of the re-creations themselves, which point to a different platform, and the testimony of the witnesses who produced them, which is internally inconsistent and in conflict with Stake's prior submissions.

Foremost, the re-creations implicate a platform that isn't at issue in this case. A screen recording of the full registration webpage that Stake produced shows the registration modal layered on a Stake.com page. (Ex. 2, STAKE 000046.) Stake.com is the international gambling platform that Stake's parent company operates; the re-creation depicts that site, not the Stake.us website this case is centered on. That it shows the wrong platform is confirmed throughout the screenshot. The footer is filled with cryptocurrency logos, and the age restriction reads "18+." (*Id.*) Stake.us is a so-called "social casino" that operates on virtual currencies it calls "Gold Coins" and "Stake Cash"—not cryptocurrency—and requires users to be at least 21. (Dkt. 57-3 at 6, 10–12.) The MAW recording even more transparently reflects the wrong website. It displays a Bitcoin wallet balance at the top of the screen, (dkt. 57-10), and the Terms in the scroll window expressly refer to "stake.com," the wrong website, (dkt. 57-9; dkt. 57-10). Stake's counsel even admitted that those Terms are not what Stake.us would have displayed to Plaintiff on May 17, 2023, (Ex. 3, Feb. 2, 2026 Email from Robert Ward). Stake cannot rely on these screenflows to show Plaintiff agreed to arbitrate his claims against a website they do not depict.

Stake's witness testimony further undermines any argument that the re-creations authentically reflect what Plaintiff would have seen. Mr. Craven submitted two separate

9

declarations describing a registration process the re-creations do not match. He swore that users were required to check a box next to specific text and that the Terms hyperlink "appeared in a different color than the rest of the statement." (Dkt. 13-1 ¶ 9.) The re-created screenshot shows no checkbox, no contrasting color, and different text. (Dkt. 57-7; *see* Ex. 1, Galavalli Dep. at 156:5–11 (Mr. Galavalli confirming that the re-creation contains no checkbox and that the Terms text is "the same color as the rest of the text").) Stake's counsel represented that Mr. Craven would amend his declaration to address what the production showed. (Dkt. 44-5, Ex. D-1.) Stake instead dropped him as a witness and substituted Mr. Galavalli.

Mr. Galavalli's testimony raises more questions. While his declaration claims he created the MAW recording, (Dkt. 57-6 ¶¶ 22, 35), he straightforwardly denied creating the MAW recording at his deposition. (Ex. 1, Galavalli Dep at 137:7–8 (Q: "Did you create this [MAW] screen recording?" A: "I don't remember.").) And the declaration's representation that the MAW recording shows what users encountered on May 17, 2023 is at odds with his deposition testimony that he could not verify whether the recording's appearance matched what users actually saw on that date, and that a dev ops engineer would need to review the code to do so. (*Id.* at 145:17–146:20; 52:5–10.)

This all comes against the backdrop of Stake's sworn claims that the relevant screenflows could not be re-created because "technical limitations" precluded Stake from doing so. (Dkt. 28-1 ¶¶ 6–7; dkt. 25-1 at 7–8.) In sum, first the screenflows could not be produced at all. Then the ones that were eventually provided show a completely different process from the one Stake relied on in its initial motion, with no explanation at all as to why there was any shift or any attempt to correct the record. And those that were produced don't even show the right website. Taken together, this "independent evidence" calling "the accuracy of the screenshot[s]" into

10

question independently establishes their inadmissibility. *Hamera*, 790 F. Supp. 3d at 670.

### 2. Stake's Re-creations Are Inadmissible Hearsay.

Besides failing Rule 901(a)'s authentication standards, the re-creations are out-of-court statements offered for the truth of what they purport to depict, what Plaintiff saw on Stake.us, and are therefore inadmissible hearsay. Fed. R. Evid. 801(c). Stake may contend that these are admissible under the business records exception. Fed. R. Evid. 803(6) (allowing records "made at or near the time by—or from information transmitted by—someone with knowledge," "kept in the course of a regularly conducted activity," "mad[e] . . . [as] a regular practice of that activity," supported by custodian testimony or certification, and not shown to be untrustworthy). As explained above, these screen recordings were created for this litigation in what was apparently the wrong test environment, using incomplete code. While they fail to meet any step of the exception analysis, "the method or circumstances of preparation indicate a lack of trustworthiness" and render the exception unavailable. Fed. R. Evid. 803(6)(E).

The party invoking the exception must provide "sufficient facts to warrant a finding that the records are trustworthy." *United States v. Briscoe*, 896 F.2d 1476, 1495 (7th Cir. 1990); *M&G Health Assocs., Inc. v. Health Care Serv. Corp.*, No. 08 CV 3944, 2009 WL 10740611, at *3 (N.D. Ill. Feb. 24, 2009) (striking computer-generated records where the proponent's reliability assertions were "ambiguous and conclusional" and "unexplained discrepanc[ies]" further "compromised" trustworthiness). For substantially the same reasons discussed above, Stake fails to do so here. The fact that the screen recordings apparently come from Stake.com; the unexplained substitution of Mr. Galavalli for Mr. Craven; and that the re-creations include completely different screenflows from the ones previously described as being impossible to produce all show a lack of trustworthiness. Courts confronted with similar after-the-fact re-creations have found such evidence barred. For example, in *Monper v. Boeing Co.*, No. C13-

11

1569 RSM, 2016 WL 1703839, at *4 (W.D. Wash. Apr. 28, 2016), a defendant tried to utilize the business records exception for re-creations of data allegedly transmitted to plaintiffs. The court found that even if the underlying data was accurately kept in the course of business, the defendant failed to demonstrate that the re-creations were "authentic representation[s] of the *communication* of that data." *Id.* at *4 (emphasis in original). It subsequently barred the communications. (*Id.*) Even setting aside the glaring issues of inaccurate data here, there is insufficient evidence establishing that data was displayed to Plaintiff in the way Stake claims with the trustworthiness the rule requires. Stake cannot rely on the business records exception to overcome the screenflows' inadmissibility.

### B. The Re-creations Do Not Establish Assent to Arbitrate.

Besides being inadmissible, Stake fails to show an agreement to arbitrate. Stake claims Plaintiff agreed to arbitrate when he registered in August 2022 and again in May 2023, when it argues the MAW was displayed. Neither satisfies the two-part test the Seventh Circuit uses to determine when an online arbitration agreement is enforceable. *Domer*, 116 F.4th 686. Under *Domer*, such an agreement is only enforceable if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action . . . that unambiguously manifests his or her assent to those terms." *Id.* at 695 (citation omitted). Neither element is met here.

### 1. The August 2022 Registration Page Does Not Establish Assent.

When assessing whether a website provides reasonably conspicuous notice of hybridwrap agreements like the registration terms, courts assess factors such as the clarity of the disclosure, the design and appearance of the hyperlinks, the simplicity of the screen, the spatial placement of any terms and conditions disclosure, and the temporal relationship to the user's action. *Domer*, 116 F.4th at 695. Investigating these elements of the registration page shows Stake provided

12

inadequate notice of the arbitration terms.

*Clarity.* The disclosure underneath the action button on the registration page states that clicking "Play Now" indicates that the user has "read and acknowledge[d] the Terms & Conditions." (Dkt. 57-7.) That phrasing does not communicate agreement. "[A]cknowledge" means "[t]o recognize (something) as being factual or valid[,]" not to agree to be bound by it. *Compare Acknowledge*, BLACK'S LAW DICTIONARY (12th ed. 2024), *with Assent*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("Agreement, approval, or permission"). A user who clicks "Play Now" after seeing this disclosure has, at most, indicated awareness that the terms exist. This distinction is dispositive. In *Shockley v. PrimeLending*, the Eighth Circuit held that an "acknowledgment" of an employee's review of a handbook containing an arbitration provision was not "an unequivocal acceptance" sufficient to form an enforceable agreement to arbitrate. 929 F.3d 1012, 1019 (8th Cir. 2019). The court explained that an "acknowledgment" reflects "general knowledge or awareness of the existence of a contract"—not the "positive and unambiguous unequivocal acceptance" required to form one. *Id.* (citation omitted). That reasoning applies here. When courts enforce online agreements, the disclosure language directly links the user's action to agreement—for example, "By submitting your order you accept our Terms of Order," *Domer*, 116 F.4th at 692, or "By placing your order, you agree to our . . . Terms and Conditions," *Hamera*, 790 F. Supp. 3d at 666. Those disclosures leave no ambiguity about the legal effect of the click. The disclosure here does not.

*Design.* The disclosure's design is lacking because the "Terms and Conditions" hyperlink appears in the same color as the surrounding text. (Dkt. 57-7.) The text is barely bolded, white-grey against a dark background, and hardly discernible. It is not in all caps, underlined, blue, or otherwise set apart as a hyperlink typically is. *Domer*, 116 F.4th at 696–97. This subtle bolding is

13

not enough. *See Johnson v. Hum. Power of N Co.*, 767 F. Supp. 3d 845, 853 (N.D. Ill. 2025) (insufficient notice when link was "only underscored and not marked in bold, all capital letters, or a different color font"). The record is silent as to whether the font changes color when a user hovers over it in a way that would signal clickability. *See Fitzpatrick v. Lens.com Inc.*, No. 24 CV 2700, 2024 WL 4555337, at *2 (N.D. Ill. Oct. 23, 2024).

*Simplicity of the screen.* This factor asks about "the simplicity of the information on the screen and the way that information is presented." *Domer*, 116 F.4th at 695. While Stake only attaches a cropped screenshot, the full screen Plaintiff ostensibly saw shows the registration modal sitting atop a webpage marked with cryptocurrency logos, a "Buy Crypto" button, sports betting imagery, a side menu, and a multi-section footer. (*See* Ex. 2, STAKE 000046.) This is not an "uncluttered" interface with a limited set of elements that make the disclosure likely to stand out. *Domer*, 116 F.4th at 696; *cf. Fitzpatrick*, 2024 WL 4555337, at *2 (depicting structured purchase workflow with terms disclosed beneath the operative button in hyperlink that changed appearance).[3] The registration page is closer to the cluttered displays courts have rejected for failing to direct attention to the disclosure. *See Wilson*, 448 F. Supp. 3d at 884–85 (assent lacking where screens presented multiple interface elements and did not direct attention to the terms).

These deficiencies bear on *Domer's* second requirement—whether the user took an action that unambiguously manifested assent to the Terms. *See* 116 F.4th at 695. The re-creation does not make that connection clear. As noted, clicking the "Play Now" button only indicates an acknowledgment of the Terms' existence, not an agreement to them or acceptance of any legal effect. *See Sgouros*, 817 F.3d at 1035 ("[W]here a website specifically states that clicking means

---

[3]     While the disclosure appears near the action button, no single factor is dispositive. *Domer*, 116 F.4th at 695. And proximity is irrelevant where, as here, the action button is divorced from the language next to it. *See Sgouros*, 817 F.3d at 1036.

one thing, that click does not bind users to something else."); *Johnson*, 767 F. Supp. 3d at 851 (finding no assent where "[n]othing in th[e] disclosure alert[ed] the consumer that by clicking the 'GET 15% OFF NOW' button they [were] assenting to the hyperlinked terms"); *Anand v. Heath*, No. 19-cv-00016, 2019 WL 2716213, at *4 (N.D. Ill. June 28, 2019) (finding a hybridwrap agreement unenforceable where "the website did not include language explaining that clicking the 'Continue' button would constitute assent to the terms and conditions"). What's more, Stake fails to show what was behind the "Terms and Conditions" hyperlink in the screenshots. The re-creation does not include the underlying "data" that would have been delivered to users— including the Terms themselves—and therefore does not reflect "what exactly would the user have looked at." (Ex. 1, Galavalli Dep. at 37:10–19.) Without evidence of what content a user would have seen after clicking the hyperlink, Stake cannot show that Plaintiff received notice of the agreement it seeks to enforce. *See Anand*, 2019 WL 2716213, at *1, 3–5 (denying motion to compel where defendants offered no evidence that plaintiff saw the terms or clicked the hyperlink); *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1331 (11th Cir. 2016) (denying motion to compel where "there [was] no evidence concerning what, if any, clickwrap agreement appeared on plaintiff's computer screen"); *Mason*, 815 F. App'x at 325 (finding no assent when defendant failed to show "what terms [the plaintiff] actually saw . . . when he viewed the website"). Because Stake fails to show that Plaintiff took any concrete action to manifest agreement to arbitrate—even failing to show how any purported terms would have been displayed to him—Stake fails to carry its burden.

> **2.** **The May 2023 Mandatory Acceptance Window Does Not Establish Assent.**

The re-creation of the 2023 MAW also fails to establish Plaintiff manifested assent to arbitrate. The video re-creation includes elements of a "scrollwrap" agreement, where a user

15

must scroll through purported terms before clicking a button. *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 395 (E.D.N.Y. 2015). Nevertheless, "the Court's duty to inquire into the reasonableness of [defendant's] presentation of its terms and whether [plaintiff] objectively assented to them remains unchanged." *Campos v. Tubi, Inc.*, 716 F. Supp. 3d 623, 631 n.5 (N.D. Ill. 2024). Here, Stake has not provided evidence that would allow the Court to answer this "fact-intensive" inquiry. *Id.* Instead, Stake submitted after-the-fact re-creations of workflows that reflect the wrong website, and that do not actually show the terms that Stake claims Plaintiff saw.

As to the MAW, Stake cannot say it reflected the workflow existing in May 2023, rather than in the 2025 test environment. (Ex. 1, Galavalli Dep. at 144:23–145:2.) Mr. Galavalli conceded he "would not be able to say this is the exact thing that the user would have seen." (*Id.* at 146:4–6.) This failure is compounded by the inability to identify the content displayed in the screens, down to the terms themselves that Stake seeks to enforce. The text shown in the scroll window again reflects the wrong website. As Stake acknowledged, "the text in the scroll window . . . is not the same text the Stake.us platform would have displayed on May 17, 2023." (Ex. 3, Feb. 2, 2026 email from Robert Ward.) Without evidence of what terms were in place and how they were presented—evidence that Stake has already said it cannot provide, (dkt. 28-1 ¶¶ 6–7)—Stake cannot show that Plaintiff received notice and agreed to the terms it seeks to enforce. *See Anand*, 2019 WL 2716213, at *3; *Mason*, 815 F. App'x at 325.

## II. THE ARBITRATION CLAUSE AND DELEGATION CLAUSE ARE UNCONSCIONABLE AND, THEREFORE, UNENFORCEABLE.

Stake's arbitration clause is unenforceable because it is unconscionable. Moreover, this Court—not an arbitrator—must decide the issue of unconscionability.

### A. The Arbitration Clause Is Unconscionable.

A contract can be found unconscionable on "either procedural or substantive grounds."

*Fahy v. Minto Dev. Corp.*, 722 F. Supp. 3d 784, 804 (N.D. Ill. 2024). While either is sufficient, *Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 21 (2006), Stake's clause presents both.

**1.     The Arbitration Agreement Is Substantively Unconscionable.**

Substantive unconscionability is assessed on a "case-by-case basis, considering the totality of the circumstances," *Kinkel*, 223 Ill. 2d at 42–43, evaluating whether terms are "so one-sided that they oppress or unfairly surprise an innocent party[;]" create an "overall imbalance in the obligations and rights imposed by the bargain[;]" or show "significant cost-price disparity." *Turner v. Concord Nursing & Rehab. Ctr., LLC*, 2023 IL App (1st) 221721, ¶ 20, *appeal denied*, 221 N.E.3d 347 (Ill. 2023). Stake's agreement is unconscionable for several reasons.

First, Stake bars "Collective Action[s]"—claims brought "concurrently" by counsel that is "the same, or share[s] fees, or coordinate[s] in any way." (Dkt. 57-2 at 28.) Thus, if Mr. Urdan initiated an arbitration against Stake, another claimant could not until Mr. Urdan's was complete (unless that plaintiff secured different, independent counsel and in no way coordinated with Mr. Urdan). With over a thousand Illinois users in the class, the resulting delay would stretch centuries, preventing many from having their claims heard at all. While Stake benefits from this delay, it "burden[s] an individual customer's ability to vindicate [their] claims" and reflects the kind of one-sided imbalance Illinois treats as substantively unconscionable. *Kinkel*, 223 Ill. 2d at 42 (2006). The provision forces users to choose between their preferred counsel and timely arbitration, effectively constraining their choice of counsel. *Pandolfi v. AviaGames, Inc.*, No. 23-cv-05971, 2024 WL 4051754, at *11 (N.D. Cal. Sept. 4, 2024) (finding such limiting clause unconscionable). Stake faces no such constraint. *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1042. That repeat-player advantage is compounded by a confidentiality clause barring

17

users—but not, in practice, Stake—from drawing on past proceedings. (Dkt. 57-2 at 28); *see Bain v. Airoom, LLC*, 2022 IL App (1st) 211001, ¶ 39.

Second, Stake's agreement is unconscionable because the disparity between the cost to vindicate a claim and the potential recovery is "so large and prohibitive so as to essentially preclude one from taking action." *Willis v. Captain D's, LLC*, 2015 IL App (5th) 140234-U, ¶ 32; *Kinkel*, 223 Ill. 2d at 29–30. Stake purports to cap damages at "the amount you have paid us in the thirty (30) days immediately preceding the date on which you first assert any such claim pursuant to [the arbitration clause]," (dkt. 57-2 at 25–26), and bar punitive damages and attorneys' fees outright. (*Id.* at 24–25.) The practical effect of these limitations is to reduce any claimant's possible recovery by a staggering percentage, given the amount of money that individuals like Mr. Urdan have lost to Stake over their years of gambling. (Compl. ¶ 74.) Illinois courts find limits on compensatory damages unconscionable even where they apply to both parties. *See Hwang v. Pathway LaGrange Prop. Owner*, 2024 IL App (1st) 240534, ¶ 22; *see also Razor v. Hyundai Motor Am.*, 222 Ill. 2d 75, 105 (2006) (finding limitation of damages unconscionable in warranty agreement). Here, they apply only to Stake.

Additionally, contracts are "void and unenforceable" when they limit recovery of punitive damages or attorney's fees, particularly when, as here, the case involves claims under the Consumer Fraud Act. *Bain*, 2022 IL App (1st) 211001, ¶ 33; *see also Turner*, 2023 IL App (1st) 221721, ¶ 34 (holding bar on award of punitive damages and attorneys' fees "unconscionable for contravening clear statutory language"). That's because no attorney would undertake the "significant investment of time and resources" necessary to litigate complex statutory claims when the overall cost of arbitration would be higher. *Keefe v. Allied Home Mortg. Corp.*, 393 Ill. App. 3d 226, 236 (2009). The combined effect of these provisions is to

18

make relief practically unattainable and to insulate Stake from an entire class of claims.

### 2. The Arbitration Agreement Is Procedurally Unconscionable.

While substantive restrictions should alone invalidate the arbitration clause, *Kinkel*, 223 Ill. 2d at 21, significant procedural deficiencies offer further support for finding it unenforceable. Procedural unconscionability exists where, "after considering all of the circumstances," terms are "so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware [he] was agreeing to [them]." *Turner*, 2023 IL App (1st) 221721, ¶ 20. Illinois courts are "more likely to find unconscionability" where "a consumer is involved," "there is a disparity in bargaining power," and the agreement is "on a pre-printed form." *Kinkel*, 223 Ill. 2d at 24.[4]

Here, Stake presented its adhesion contract to consumers—some of whom, Plaintiff alleges, are addicted to its games—on a "take-it-or-leave-it" basis. *Kinkel*, 223 Ill. 2d at 24; *see Kater v. Churchill Downs Inc.*, 423 F. Supp. 3d 1055, 1062 (W.D. Wash. 2019) (recognizing addictive online casino games heighten coercive effect of one-sided terms). The arbitration provisions span twenty-five pages of single-spaced text, with critical components scattered across separate clauses—procedures in clause 26, damages limits in clause 24—all embedded within a "maze of fine print." *Williams v. TCF Nat'l Bank*, No. 12 C 05115, 2013 WL 708123, at *6 (N.D. Ill. Feb. 26, 2013). The result is a "confusing" and "opaque" contract, *Copper Bend Pharmacy, Inc. v. OptumRx*, 2023 IL App (5th) 220211-U, ¶ 22, that the average consumer will find "difficult to find, read, or understand." *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 777 (7th Cir. 2014). Nor do the Terms disclose the $225 non-refundable filing fee or the thousands of dollars in attorneys' fees a claimant would face. *See Kinkel*, 223 Ill. 2d at 27. The terms are

---

[4]     Stake abandoned the argument raised in its original motion regarding consumers' alleged ability to opt-out of some version of the arbitration provision. (*Compare* Memorandum in Support of Motion to Compel ("Mot.") at 13–15, *with* Dkt. 13 at 3, 7.)

procedurally unconscionable and should not be enforced.

### B. The Court—Not an Arbitrator—Decides Unconscionability Because the Delegation Clause Itself is Unconscionable.

Stake argues a delegation clause requires that the arbitrator, not the Court, decides unconscionability. (Mot. at 13–15.) But Illinois courts have held that the threshold issue of arbitrability is reserved for the courts, not arbitrators:

> When a party challenges the validity of an arbitration agreement, the court *must* consider the challenge before ordering compliance with the arbitration agreement even if a delegation clause purports to reserve that issue for the arbitrator. That rule applies to unconscionability as well because if a court finds that an arbitration agreement as a whole is unconscionable, then it cannot enforce a delegation within that arbitration agreement.

*Geller v. Uber Techs., Inc.*, 2025 IL App (1st) 241458-U, ¶ 20 (quotations omitted).

Regardless, even if the delegation clause were considered, the delegation clause itself is substantively and procedurally unconscionable (and therefore unenforceable). *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 74 (2010). In challenging the delegation clause, plaintiffs "may rely on the same arguments that [they] employ[] to contest the enforceability of other arbitration agreement provisions," including unconscionability. *Fahy*, 722 F. Supp. 3d at 797 (quotation omitted). Here, the delegation clause suffers from the same defects raised above with respect to the arbitration clause.[5]

## CONCLUSION

Stake's renewed motion to compel arbitration should be denied.

---

[5] Nor should this Court attempt to save the arbitration clause by severing the many unconscionable provisions. Doing so would be "tantamount to rewriting the Agreement," given these provisions do not operate independently. *Sanchez v. CleanNet USA, Inc.*, 78 F. Supp. 3d 747, 757 (N.D. Ill. 2015). Furthermore, courts "should be cautioned against [severing these kinds of provisions], as it discourages the narrow and precise draftsmanship which should be reflected in written agreements." *Hwang*, 2024 IL App (1st) 240534, ¶ 27 (cleaned up).

Respectfully Submitted,

**BRAYDEN URDAN,** individually and on behalf of all others similarly situated,

Dated: May 15, 2026

By: *Michael W. Ovca*
One of Plaintiff's Attorneys

Michael W. Ovca
movca@edelson.com
J. Eli Wade-Scott
ewadescott@edelson.com
Hannah Hilligoss
hhilligoss@edelson.com
Ari J. Scharg
ascharg@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel.: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff and the putative class*

21